[Cite as *State v. Montgomery*, 2020-Ohio-5594.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellant/<br>Cross-Appellee, | : | |
| | : | No. 19AP-41 |
| v. | | (C.P.C. No. 10CR-7125) |
| | : | |
| Caron E. Montgomery, | : | (REGULAR CALENDAR) |
| Defendant-Appellee/<br>Cross-Appellant. | : | |
| | : | |

D E C I S I O N

Rendered on December 8, 2020

**On brief:** *Ron O'Brien,* Prosecuting Attorney, and *Steven L. Taylor*, for appellant/cross-appellee State of Ohio. **Argued:** *Steven L. Taylor.*

**On brief:** *Timothy Young*, Ohio Public Defender, *Richard A. Cline, Kimberly S. Rigby,* and *Melissa Jackson,* for appellee/cross-appellant Caron E. Montgomery. **Argued:** *Melissa Jackson.*

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Plaintiff-appellant/cross-appellee, State of Ohio, appeals the December 31, 2018 judgment of the Franklin County Court of Common Pleas granting in part and denying in part defendant-appellee/cross-appellant, Caron E. Montgomery's, petition and amended petition for postconviction relief ("Postconviction Decision"). For the reasons that follow, we affirm.

{¶ 2} This case has previously been before the Supreme Court of Ohio. Affirming on direct appeal Montgomery's convictions and death sentences, the Supreme Court recited:

> On Thanksgiving Day 2010, appellant, Caron Montgomery, murdered his former girlfriend, Tia Hendricks; their two-year-old son, Tyron Hendricks; and Tia's nine-year-old daughter, Tahlia Hendricks. Montgomery entered a guilty plea to charges of murder, domestic violence, and aggravated murder with capital specifications. In 2012, a three-judge panel [after hearing evidence and finding him guilty on the capital counts and specifications] unanimously sentenced him to death for the aggravated murders of Tyron and Tahlia and to 15 years to life in prison for Tia's murder.

*State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, ¶ 1, *recon. granted in part*, 147 Ohio St.3d 1438, 2016-Ohio-7677.

{¶ 3} The death penalty specifications were: (1) Montgomery had murdered each child as part of a course of conduct involving his purposeful killing of two or more persons, and (2) each child was under the age of 13 and Montgomery was the principal offender or committed the murder with prior calculation and design; with regard to Tia, Montgomery also pled guilty and was convicted of an additional specification that he committed the murder for the purpose of escaping detection, apprehension, trial, or punishment for the crime.

{¶ 4} At the trial level, Montgomery waived a jury trial and presented his pleas of guilty to a three-judge panel (the "three-judge panel" or the "panel"). The three-judge panel accepted the pleas, held a hearing on mitigation, and ultimately sentenced Montgomery imposing the death penalty. In the interim, between his 2012 convictions and resolution of his direct appeal in 2016, Montgomery petitioned the common pleas court for postconviction relief. (Apr. 25, 2013 Am. Petition.) He argued he received ineffective assistance of counsel during both the trial and penalty phase. The trial court denied the petition without conducting an evidentiary hearing. Montgomery appealed and this court reversed and remanded to the trial court to conduct an evidentiary hearing on the petition for postconviction relief. *State v. Montgomery*, 10th Dist. No. 13AP-1091, 2014-Ohio-5756 (Dorrian, J., concurring in part; dissenting in part; and concurring in judgment).

{¶ 5} On remand, the trial judge, who had previously presided on the three-judge panel, held a hearing on the petition and agreed with Montgomery as to mitigation efforts, albeit not with regard to the convictions themselves. The trial court granted his petition in part and ordered a new mitigation/sentencing phase proceeding. The state appeals this ruling and assigns as error other perceived defects in the trial court's decision, while

Montgomery's cross-appeal challenges the trial court's denial of his claim of ineffective assistance of counsel during trial and his claim that his sentence was disproportionate.

## I. Facts and Procedural History

### A. Pleas, Sentencing, and Direct Appeal

{¶ 6} The Supreme Court's summary from the direct appeal sketching the testimony of the state's only witness, Detective Dana Croom, provides some introductory background:

> On Thanksgiving morning, Columbus police received a 9-1-1 call from a female caller. Croom testified at the plea hearing that the dispatcher "could hear [the female caller] yelling, 'Caron, Caron.' " Police traced the call to Tia Hendricks's phone, and the dispatcher triangulated the call to * * * Rosslyn Avenue in Sharon Township. Croom explained that the Rosslyn Avenue address was "less than a hundred yards" from the apartment building where Tia resided, * * * Broadmeadows. However, officers were unable to locate the exact apartment from which the 9-1-1 call came.
>
> According to Croom, Tia's family contacted police on the day after Thanksgiving after becoming concerned that she and her children had not shown up for Thanksgiving dinner. Tia's coworkers were also concerned that she had not reported to work on Friday.
>
> Columbus police went to Tia's apartment. Although Croom was not one of the responding officers, he testified that police found no signs of forced entry. In fact, the door to Tia's apartment was locked from the *inside* with a chain lock, which officers cut with a bolt cutter. The chain part of the lock and the inside doorknob were smeared with what appeared to be blood. Officers discovered the bodies of Tia, Tahlia, and Tyron on the living-room floor. All three were pronounced dead at the scene. According to Croom, a police lieutenant who checked the condition of the bodies described them as "cold," meaning that "they had been dead for a while."
>
> Tia was lying on her back, arms outstretched, with her head and upper torso covered by an article of clothing. Her blue jeans were undone and pulled slightly down, exposing her underwear, and there were several credit and identification cards and an unopened condom package askew on the floor near her head. Tahlia and Tyron were lying face up near the couch, their heads each covered with a blood-stained pillow.

Officers discovered Montgomery alive and lying on the bed in the master bedroom. He appeared to be injured. Officers could not tell the extent of his injuries, but could see "a little bit of blood." Croom testified that "when the officers * * * eventually turned him over, he had a knife * * * barely in his neck. When they rolled him over to try to put him on the stretcher, the knife fell off onto the bed." Montgomery was treated for superficial injuries to his neck, arms, hands, and the top of his head. Croom did not personally observe Montgomery's injuries, but he testified that the lieutenant who did opined that the injuries to his neck were "fresh."

Croom testified that the police "had people who said that [Montgomery] had lived in [Tia's] apartment." And Tia's mother, Deborah Hendricks, told Croom that Tia and Montgomery had "argued a lot" during their off-and-on relationship. The state also introduced a Franklin County Municipal Court complaint charging Montgomery with domestic violence and assault against Tia and the related judgment entry indicating that in 2009, he had pleaded guilty to and was convicted of the domestic-violence charge.

Croom also testified about the autopsies conducted by Franklin County Deputy Coroner Dr. Tae L. An on November 27 and 28, 2010. Tia's autopsy revealed 23 stab wounds to her neck, left flank, back, left shoulder, and right forearm. As described in the autopsy report, Dr. An concluded that Tia's death was caused by two stab wounds in particular, one that lacerated the left common carotid artery and one that lacerated the right internal jugular vein. In addition, Dr. An located more than 20 cutting wounds to the upper portion of Tia's body and found that these wounds contributed to her death. At the plea hearing, Croom opined that the wounds to Tia's hands and arms are "[c]ommonly referred to as defensive wounds."

Tahlia's autopsy revealed five stab wounds around her neck and nine cutting wounds to her chin, right shoulder, and right arm that Croom identified as defensive wounds. The autopsy report indicated that stab wounds to the front of her neck severed the left and right common carotid arteries and the left internal jugular vein and caused her death.

Tyron's autopsy revealed that "[o]ne large, widely gaping, incised wound" to the front of his neck lacerated the right internal jugular vein, trachea, and esophagus, causing his death. Croom testified that Dr. An found no defensive wounds

and that the wound to Tyron's neck was actually created by two separate injuries.

Officers from the crime-scene unit photographed and documented the scene in the apartment and collected evidence. From the master bedroom, officers collected the knife that fell out of Montgomery's neck, a bleach bottle that appeared to have blood on it, and a pair of men's pants with apparent blood stains. The knife was over 12 inches long, the blade accounting for just over half the total length, and it was bloody and bent. Subsequent DNA testing confirmed that the blood present on the knife, the bleach bottle, and the pants collected from the bedroom matched Montgomery. Croom opined that the presence of Montgomery's blood on the knife blade indicated that he had injured his hands when they slipped down the blade while he was stabbing and cutting the victims.

Croom testified that crime-scene-unit officers also observed near the entrance to the apartment a pair of men's shoes that appeared to have blood on them. They also noted a bloody shoeprint nearby. Officers collected a blood swab from the top of a space heater found near the entrance to Tahlia's bedroom and a blood swab from the hallway wall just outside her bedroom. Results of DNA testing done on both blood swabs indicated that they were a match to Tia's DNA profile.

Officers also collected evidence from Tia's car, which was found in a parking lot in front of a different building in the apartment complex. Family members told police that Tia usually parked her car near her own building. During a canvass of the area, officers spoke to a female witness * * * who told them that on Thanksgiving evening, she saw a black male exit the vehicle and proceed "southbound and then westbound behind her apartment, which was * * * Broadmeadows." [She] was unable to identify Montgomery as the person she saw get out of the car. Blood swabs collected from the steering wheel and gear shift knob of Tia's car matched Montgomery's DNA profile.

(Emphasis sic.) *Montgomery*, 2016-Ohio-5487, at ¶ 5-16.

{¶ 7} In the opening statement of the sentencing hearing, Montgomery's lawyer described him as having been raised by "a mother who consumed alcohol and drugs," abandoned by his father, and raised in a house where "[h]is step[dad] abused his mother physically, abused drugs, sold drugs, [and] was never a positive role model." (May 8, 2012

Tr. Vol. VIII at 173-74.) As a child, Montgomery was "brutally raped by a gang of boys in the neighborhood. He never received adequate treatment for that rape." (May 8, 2012 Tr. Vol. VIII at 174.) In addition, he "was sexually abused by older females and older teenage girls. Again, he never received treatment for this sexual abuse." Eventually, his mother "signed him over to Children Services," and "the system failed him." (May 8, 2012 Tr. Vol. VIII at 174-75.)

{¶ 8} Seven witnesses testified on mitigation. All were lay witnesses as Montgomery's attorneys had retained experts but decided against calling them. Montgomery's 17-year-old son, Kaelen Montgomery, testified his father, while only a sporadic presence, had been a positive influence in his life and encouraged him. When Kaelen would "get in trouble," Montgomery would "come around and just show me the right path and tell me stay out of trouble, listen to my mom more." (May 8, 2012 Tr. Vol. VIII at 181.) For Kaelen, it was important that his father live "[b]ecause he can still influence me [from] behind bars. We can still have our conversations as father and son." (May 8, 2012 Tr. Vol. VIII at 184.)

{¶ 9} Caron Terrell Montgomery ("Terrell"), Montgomery's oldest son, also testified. He stated he was "real close" to Montgomery when growing up. "I still need him during my day-to-day life. I need him for advice. * * * I made some mistakes and he'd be there to still teach me." (May 8, 2012 Tr. Vol. VIII at 192.) When asked, Terrell stated he did not see his father abuse his mother while growing up, but knew that "it happened" because "you'd be able to see black eyes, all that afterwards." (May 8, 2012 Tr. Vol. VIII at 195.) He stated the abuse "wouldn't be too often. I guess whenever they ha[d] a disagreement about something." (May 8, 2012 Tr. Vol. VIII at 196.)

{¶ 10} Ryan Clark, Montgomery's younger brother, testified Montgomery had "treated [him] fair" and acted "like a big brother." (May 8, 2012 Tr. Vol. VIII at 200.) He stated Montgomery was "loving" with his own children, his life was worth saving, and he could "still be a positive influence." (May 8, 2012 Tr. Vol. VIII at 201.) Montgomery advised Clark not to use drugs, alcohol, or cigarettes, and helped him get a job.

{¶ 11} Cyrill Montgomery, Montgomery's cousin, testified he had lived in Montgomery's house for five years when they were teenagers. He stated that Montgomery's mother had an alcohol problem and used crack cocaine. He believed Montgomery loved him like a brother and was a good person. Cyrill stated Montgomery always worked and

supported his children "[a]s much as he could." (May 8, 2012 Tr. Vol. VIII at 221.) He recalled Montgomery's nickname was "poodle" and "we called him a gentle giant because, you know, he always ran from a fight to whereas we fought." (May 8, 2012 Tr. Vol. VIII at 226.)

{¶ 12} Tanika Montgomery, Cyrill's wife, also testified. She described Montgomery's family dynamic as "a cycle like of poverty and drug use and verbal abuse." "The cycle of nobody graduating from high school, people abusing drugs, cussing out your children, letting your children run wild. I just don't agree with that, those type of behaviors." (May 8, 2012 Tr. Vol. VIII at 233.) She described marijuana and alcohol abuse in front of children, and children being allowed to smoke cigarettes. Tanika described Montgomery's mother as "disengaged." (May 8, 2012 Tr. Vol. VIII at 236.) Tanika stated she still believed Montgomery's life had value and that he was "a good person." (May 8, 2012 Tr. Vol. VIII at 237.) He "always showed love towards children." (May 8, 2012 Tr. Vol. VIII at 238.)

{¶ 13} Roberta Thomas, who worked as a youth leader at Franklin County Children Services ("FCCS"), knew Montgomery when he was a juvenile at Franklin Village. At that time, he was "one of the youth in our cottage." (May 8, 2012 Tr. Vol. VIII at 244.) Montgomery was placed in the cottage with the older boys because he "was such a big guy at that age," a placement Thomas believed was inappropriate. (May 8, 2012 Tr. Vol. VIII at 246.) She stated that "nobody" on the staff "really wanted to deal [with him]," and she believed he was placed there so "the older boys would * * * correct him, beat [his] behind, do whatever to get him in shape so he wouldn't be a problem in the younger kids' cottage." (May 8, 2012 Tr. Vol. VIII at 246-47.) At times, Montgomery would earn the right to go home for the weekend, but "he didn't get to go home because his mom didn't come and get him." (May 8, 2012 Tr. Vol. VIII at 249.) Thomas firmly believed that FCCS failed Montgomery. According to her, FCCS "was moving them through, getting them out. Not really giving them what they needed to become what they need[ed] to be in society." (May 8, 2012 Tr. Vol. VIII at 255.) She believed Montgomery was "taking responsibility for the actions that he caused. That's a real big step for a kid that never had to do that." She asked the court to "consider the source" and recognize there was "still value" in Montgomery. (May 8, 2012 Tr. Vol. VIII at 256.)

{¶ 14} Timothy Brown was also an FCCS youth leader at Franklin Village when Montgomery was there as a juvenile. He described Montgomery as "a good kid in

comparison to a lot of the kids that we had in and out [of] the system there." He was "a big old baby" and "was not a problem child" for Brown, who could not "remember ever having to have to deal with him on a discipline level." (May 8, 2012 Tr. Vol. VIII at 272.) Brown also testified that Montgomery's mother did not come and pick him up when he earned passes to go home. "Without a doubt," Brown believed that FCCS should have "done more" for Montgomery. Montgomery's situation was a major reason Brown "changed [his] whole view about [a] system" that, while designed to take care of children, he saw "turn around and do the total opposite, it just breaks you and breaks your heart." (May 8, 2012 Tr. Vol. VIII at 282.) Brown recalled the "treatment plan" presented to him by the FCCS caseworker and supervisor was to release Montgomery after a psychologist opined that he would hurt someone, believing "it would be better for him to be apprehended and be tried as an adult and be in the adult system instead of the juvenile system." (May 8, 2012 Tr. Vol. VIII at 283.) Brown described Montgomery as having been "discarded" by his mother and by FCCS. (May 8, 2012 Tr. Vol. VIII at 285.) On cross-examination, Brown agreed there had been discipline issues involving Montgomery "sexually acting out." (May 8, 2012 Tr. Vol. VIII at 288.)

{¶ 15} Montgomery addressed the panel, providing an unsworn statement. He apologized and stated: "I took my family. It's a selfish act. I hurt a lot of people, Tia's family, my family, everybody whoever knew me or cared about me." He asked the panel to "have mercy on [his] soul" and to "spare [his] life so [he] can at least be some type of dad from prison for" his children. He apologized to Tia's mother, stating: "[you] trusted me with [your] daughter and our kids. And I took them. I'm very sorry." (May 8, 2012 Tr. Vol. VIII at 300.) Montgomery also stated "it was just a couple times, you know, that I had domestic violence. I wasn't always violent." (May 8, 2012 Tr. Vol. VIII at 301.)

{¶ 16} Records reflecting that Montgomery had been "sexually violated at the age of four by three other male children" were submitted to the panel as part of two joint exhibits containing Montgomery's FCCS records. (Joint Ex. 1 at 4.) The records also revealed his mother told a caseworker when Montgomery was 11 that "she would be locking Caron in the home while she attended school and went to work." (Joint Ex. 1 at 4.) After he "climbed through an upstairs window and went to his mother's place of employment, [she] then decided to lock [him] in her car * * * during her working hours." (Joint Ex. 1 at 4.) His mother also "state[d] that her marriage to [Montgomery's stepdad] would be a satisfying

relationship if it were not for Caron." (Joint Ex. 1 at 4.) She "blam[ed] Caron and his behavior for all of the problems she is currently experiencing in her personal life." (Joint Ex. 1 at 5.) Montgomery's biological father was "allegedly using and selling drugs" and his stepdad was also "using and selling drugs." (Joint Ex. 1 at 5.) Also mentioned were behavioral issues such as sexually acting out and being "physically aggressive." (Joint Ex. 1 at 6.) A doctor diagnosed him with "conduct disorder, an attention deficit and being under socialized," and "recommended that [Montgomery] receive long-term residential treatment." (Joint Ex. 1 at 6.)

{¶ 17} The panel weighed the mitigating factors against the aggravating circumstances, concluded the latter outweighed the former beyond a reasonable doubt, and imposed the death penalty for the aggravated murders of Tahlia and Tyron. The panel set forth their reasoning in a separate sentencing opinion containing findings of fact and conclusions of law. (June 6, 2012 Sentencing Opinion ("Sentencing Opinion").)

{¶ 18} The panel explicitly noted that although the defense objected to the " 'plethora of evidence' " offered by the state as inflammatory and unduly prejudicial, each of the judges "have had significant prior death penalty case experience" and "gave scant consideration to the photographs." (Sentencing Opinion at 3, fn.1.)

{¶ 19} In describing the mitigation evidence presented by the defense, the panel led with the fact that Montgomery "was raped by older boys when he was four (4) years old." (Footnote omitted.) The panel further recited the testimony regarding Montgomery's deprived childhood with an absent father and a drug-abusing mother, and the testimony that "FCCS had let [Montgomery] down," in addition to the testimony about his positive attributes. They noted the defense's emphasis that Montgomery "took full responsibility for his actions," both through his plea and in his statement to the court. (Sentencing Opinion at 5.) They also noted the testimony that he "would be able to positively influence others while in prison," and his repeated expressions of remorse to the court. (Sentencing Opinion at 6.)

{¶ 20} They gave "very significant weight to the aggravating factors regarding the killing of two children, aged nine and two, respectively. The murder of innocent children, especially a two year old, is one of the most extreme of any aggravating factors." The weight of the "aggravating factor of the purposeful killing of two or more persons" had "less independent weight, because it tie[d] in with the killing of the children, which is another

specification"; the panel gave it independent weight "based on the third purposeful killing, the murder of Tia." The panel gave "some weight, but not a great deal of weight," to the last aggravating circumstance, "a purposeful killing to escape detection, apprehension, trial or punishment." (Sentencing Opinion at 6.)

{¶ 21} "The most stressed mitigating factor by [Montgomery] was his background and upbringing." The panel discussed Montgomery having been "spurned by [his] biological father" and abused by his stepdad. The panel noted the FCCS records "present a very different record" from the testimony of Thomas and Brown and show "serious delinquent activity," with a history of lying, disrespect of others, and fighting. (Sentencing Opinion at 7.) On balance, however, the panel stated "the mitigating factor related to [Montgomery's] background is entitled to some weight." (Sentencing Opinion at 8.)

{¶ 22} On the significant issue of whether Montgomery had taken full responsibility for his actions, the panel does not appear to have been swayed much by the defense's argument. "While this factor is not without some substance, the Panel's consideration of the weight to be given here is tempered by [Montgomery's] attempt to portray himself as a possible victim by inflicting some small cuts on himself prior to the arrival of the police. The timing is obviously different: [Montgomery's] taking full responsibility later in time has some merit to it, but all in all, the Panel found negligible weight to this offered mitigating factor." (Sentencing Opinion at 8.)

{¶ 23} The panel noted several witnesses testified that Montgomery's "life has value"; but, nevertheless, the panel found "precious little, if anything, in the record—from the joint exhibits, to the in-court testimony, to the unsworn statement—that suggests that [Montgomery] actually is amenable to rehabilitation." The panel noted Montgomery had left his children (before Tyron) "when they were very young," and concluded that "his life was centered around himself" with "[m]ost relationships * * * formed in spite of [Montgomery], and not because of him." The panel found the offered mitigating factor of "[p]otential for [r]ehabilitation" to be "entitled to very little weight." (Sentencing Opinion at 9.)

{¶ 24} The panel also considered Montgomery's assertions of remorse, but found it "difficult to gauge the overall authenticity of [Montgomery's] sentiments." (Sentencing Opinion at 9.) Finding that his "overall history belies a finding that his statement was a fundamentally honest one," the judges gave the mitigating factor of remorse "scant weight."

Considering the totality of the mitigating evidence, the panel found that "none of the factors presented in mitigation had any significant weight." (Sentencing Opinion at 10.)

{¶ 25} In its final weighing, the panel concluded:

> [T]he mitigation evidence paled in comparison to the aggravating circumstances. The purposeful killings of two children, both under the age of thirteen, are horrific aggravating circumstances. As a result, when the Panel voted after all discussion had been completed, each judge gave a summary of his opinion as to the weighing process, and each judge individually and independently concluded that in this case, the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.

(Sentencing Opinion at 10.)

{¶ 26} On direct review, the Supreme Court conducted an independent review and weighing of the mitigating factors against the aggravating factors under R.C. 2929.05(A) and reached the same conclusion. *Montgomery*, 2016-Ohio-5487, at ¶ 156-88. Giving more weight than the panel had to the "unstable childhood that was apparently created in no small part by his unsupportive and reproachful mother," the Supreme Court believed that Montgomery had "presented mitigating evidence deserving of some weight," but, nevertheless, concluded that "however chaotic his background was, the evidence presented does not strongly mitigate the aggravating circumstances relative to Tahlia's murder or to Tyron's murder." *Id.* at ¶ 186-87.

## B. Initial Proceedings on Montgomery's Petition for Postconviction Relief and Appeal

{¶ 27} On April 9, 2013, Montgomery filed his petition for postconviction relief alleging various claims of ineffective assistance of counsel. He filed an amended petition on April 25, 2013. The three-judge panel denied the petition without a hearing on December 2, 2013. This court reversed that ruling on December 30, 2014 for a number of reasons. *Montgomery*, 2014-Ohio-5756. First, the majority expressed a concern about whether Montgomery's counsel "was acting reasonably" when advising him to plead guilty to the murder of Tia where there was "a reasonable argument" that he could have been found guilty only of voluntary manslaughter for her death, based on having committed the act while "in a sudden fit of rage" under R.C. 2903.03(A). *Id.* at ¶ 10-13 (also expressing some sense that "an uncontrolled rage of Montgomery toward his live-in girlfriend might

have explained how he happened to kill the children"). This issue, which was not litigated on remand and is not a subject of the current appeal, appears to have been abandoned.

{¶ 28} The majority further sensed a "related problem" in the decision to proceed before a three-judge panel when "[j]uries in Franklin County have been very slow to render sentences of death," "[t]rial counsel should have an opportunity to explain at a hearing the decision about the guilty pleas and the decision to avoid a jury." *Id.* at ¶ 14. The decision stated "lead counsel stopped practicing law in central Ohio shortly after this case and moved out of the State. This presents some troubling potential explanations for the decision to shorten the proceedings." *Id.* at ¶ 22.

{¶ 29} Finally, this court was concerned that "trial counsel did not present all of the mitigation evidence which was available," and found a hearing necessary for counsel "to explain the failure to fully develop the mitigation evidence more fully." *Id.* at ¶ 23.

## C. Proceedings on Remand on Montgomery's Petition for Postconviction Relief

{¶ 30} On remand, the trial court conducted a four-day hearing to investigate these issues. Scott Weisman, Montgomery's lead trial counsel, testified about his representation and the preparation of the mitigation case. Isabella Dixon, who represented Montgomery as co-counsel, did not testify at the postconviction hearing. Weisman recalled the defense team employed the following experts: Kelly Heiby, a mitigation expert from the Ohio Public Defender's Office; Matt Sauer, an investigator; and Dr. Robert Stinson, a board certified forensic psychologist for mental health issues. Additionally, Dr. Howard Fradkin, a licensed psychologist who "would have been able to touch on [the] issue" of post-traumatic stress disorder ("PTSD") if necessary, was hired "as the case proceeded." (Aug. 21, 2017 Tr. at 32, 40.) The full team of attorneys, Heiby, and Dr. Stinson met "six to ten times." (Aug. 21, 2017 Tr. at 43.) Weisman estimated he met with Montgomery at least monthly during the representation and "more frequent than that" as the trial date approached; with jail personnel responsible for logging visits and bringing clients from their cells, "things aren't always recorded as far as the visits that occur." (Aug. 21, 2017 Tr. at 51, 53.)

{¶ 31} Weisman testified there had been "[n]onstop" plea negotiations that "probably amounted to begging at some points" by the defense to take the death penalty off the table. (Aug. 21, 2017 Tr. at 68-69.) However, the state never wavered, offered nothing

in exchange for the jury waiver, and rejected any proposed concession on limiting the evidence or for alternative sentencing.

{¶ 32} Weisman described "an overwhelming sense of nervousness" among the defense team about advising Montgomery to waive his right to a jury in favor of a three-judge panel. (Aug. 21, 2017 Tr. at 71.) He listed several "factors" they considered when recommending the jury waiver: "The evidence, the nature of the crime, the victims involved, the photographic evidence that we knew the State would be presenting, and just the overall package that the State would be able to present as far as facts supporting a conviction in this case." (Aug. 21, 2017 Tr. at 70.) Because "the evidence was * * * just overwhelming[] and gruesome," Weisman felt that "anything we could do to limit the presentation of the evidence," or discussions about it, "the less the Court would see, the less a jury would see, the better chance we stood of saving [Montgomery's] life. And that's certainly what I thought before we made that decision" to waive the jury trial and plead guilty. (Aug. 21, 2017 Tr. at 78.) Weisman had appeared before all three judges on the panel "for a significant amount of time," felt he understood their "judicial philosophy," and believed that at least two of them "would be responsive to the guilty plea." (Aug. 21, 2017 Tr. at 75.)

{¶ 33} In hindsight and given the results, Weisman admitted that the decision to advise Montgomery to plead guilty and present mitigation to a three-judge panel was "[o]bviously, based on the outcome, * * * a terrible decision." (Aug. 21, 2017 Tr. at 152.) He did know of death penalty seminars instructing practitioners "never" to have a client enter a guilty plea unless "there is an agreed sentence worked out[,] and that it otherwise was strongly encouraged not to follow that path." (Aug. 21, 2017 Tr. at 111.) He also recalled a presentation stating that three-judge panels were statistically more likely than juries to return a death sentence, as well as continuing legal education courses emphasizing that "conveying those mental health issues required expert testimony." (Aug. 21, 2017 Tr. at 112, 118.)

{¶ 34} Nevertheless, Weisman also stated that, in hindsight, he really did not "see a different path" to the plea and panel approach. (Aug. 21, 2017 Tr. at 153.) Given the atrocious facts and the relatively limited nature of the mitigation evidence, he believed the "only way * * * to try to use his acceptance of responsibility as a mitigation tool" was to go before a three-judge panel rather than a jury. (Aug. 21, 2017 Tr. at 153-54.) A jury would also not have the experience of a panel of judges in seeing the "kind of gruesomeness" that

the state's evidence would present. (Aug. 21, 2017 Tr. at 154.) Weisman spoke to "a number of attorneys who had experience in death penalty" representation who "[m]ost all were in agreement with [the] approach" to plead and go before the panel, even though there were "some voices of concern about why it may not work." (Aug. 21, 2017 Tr. at 154-55.) He also felt that a "shortened proceeding" before a three-judge panel, as opposed to a more drawn out proceeding before a jury, was "[a]bsolutely" a benefit and "part of the strategy." (Aug. 21, 2017 Tr. at 157.)

{¶ 35} He acknowledged he "could have done a better job. I could have done some things differently. By the same token, * * * I sit here today thinking what I did was the right thing to do." (Aug. 21, 2017 Tr. at 158.) He believed that "the decisions we made, to waive jury and the other things[,] * * * I think were the right strategy." (Aug. 21, 2017 Tr. at 158.) However, Weisman did also feel that "[w]e should have done things differently" during the representation of Montgomery, including: "further investigation as to his mental health state at the time the plea was entered"; "more research" on what evidence the defense might have been able to have excluded that the state used to prove the guilty plea; and the introduction of "Dr. Stinson's testimony. Leaving that out and expecting the Court, because they are more educated than the jurors that appear in front of them, to recognize there were some issues was a bad decision by me, a terrible decision by me," he averred in retrospect. (Aug. 21, 2017 Tr. at 117.)

{¶ 36} When asked, Weisman described the mitigation theme as "an all-encompassing theme revolving around the fact that [Montgomery] entered a guilty plea and * * * many other issues that we were going to try to string together." (Aug. 21, 2017 Tr. at 85.) The defense team "discussed" whether to present substance abuse as a mitigation issue, but Weisman chose not to do so because "absent it being an overwhelming factor in the actual offense itself, I didn't think it was going to serve the path we were trying to take, that this is a saveable individual. And engaging in drug use of your own volition I didn't think was the picture I was trying to paint, at least in my mind." (Aug. 21, 2017 Tr. at 105.)

{¶ 37} When asked about Dr. Stinson's presentation of his diagnosis of Montgomery's mental health issues, Weisman stated that although he could not recall the specific diagnosis, he did remember that "in my mind, in my view, it would not have been - - issues were not presented to me that I felt would have overwhelmingly assisted us in the mitigation, or my assessment of his necessity to testify would have been different than it

was." (Aug. 21, 2017 Tr. at 128.) Weisman agreed he was "still considering" whether to call Dr. Stinson as a witness "even up to within a few days of the hearing," and elaborated that "[t]he decision not to call Dr. Stinson was probably made during the actual hearing itself." (Aug. 21, 2017 Tr. at 90.)

{¶ 38} When he decided not to call Dr. Stinson, Wiseman was mindful that Dr. Stinson "was aware of * * * other violent acts by [Montgomery and] domestic violence allegations, et cetera." (Aug. 21, 2017 Tr. at 159.) Weisman "had some concern those things would have been brought up if Dr. Stinson testified that we could otherwise keep away from the three-judge panel and not hear about some of those past acts that, frankly, I was doing everything I could to keep anybody from hearing about." (Aug. 21, 2017 Tr. at 159.) In hindsight, he acknowledged he "was counting a lot on the Court. I guess I didn't feel that the psychological issues would have carried as much weight with a three-judge panel as it may have with some lay jurors." (Aug. 21, 2017 Tr. at 159.)

{¶ 39} Rather than call Dr. Stinson, whose testimony he did not believe would "offset" the negative evidence, Weisman stated his intention was to have those psychological issues presented to the three-judge panel through other witnesses. "I was counting on trying to get some of that stuff across, I guess, through the fact that he had the issues when in the State's custody and some of the other issues that the Court heard about from the lay witnesses, that there were some psychological issues there and there was some scarring there." (Aug. 21, 2017 Tr. at 160.) He did not think it would be "as useful" to have expert testimony with the panel "whereas, if you have a lay juror, they may need the explanation a little bit more than the Court would." (Aug. 21, 2017 Tr. at 160.) "Using hindsight," Weisman admitted he should have presented a psychological expert to the panel. (Aug. 21, 2017 Tr. at 192.)

{¶ 40} When asked if he had "shorten[ed]" the mitigation proceedings because he was going to be moving out of state, Weisman replied that he "was offended by the question." "No, I did nothing to shorten the proceedings. I'd never shortcut a client." (Aug. 21, 2017 Tr. at 132.) Weisman's moving date was not set in stone and he actually "continued the case twice over prosecution objection from the fall to late spring [in order to] get more information." (Aug. 21, 2017 Tr. at 132.)

{¶ 41} Weisman was presented with summaries prepared by the mitigation investigator from interviews with past girlfriends recounting domestic abuse at

Montgomery's hands; he had reviewed this information in "deciding what witnesses to call in the mitigation hearing." (Aug. 21, 2017 Tr. at 136.) One of Montgomery's former girlfriends, T.L., stated Montgomery "started hitting her after the third year they were together"; he "had abusive ways"; she called the police on him in 1994 or 1995 "because he was hitting her"; and "she stabbed him because he was strangling her," but she never pressed charges. (Aug. 21, 2017 Tr. at 134-35.)

{¶ 42} T.L. also recalled an incident with Montgomery when their son was two years old in which Montgomery "had been drinking and pushed a coat rack through the wall." She told him to leave and he responded that "if he goes then they all go." Montgomery stated: "all bitches are alike -- are all alike" and "pulled out a gun and said he would kill the kids first and then her and himself." (Aug. 21, 2017 Tr. at 135.) Weisman agreed this incident would have been "very damning" to have presented during mitigation and stated this "was the reason that we didn't call [her] as [a] witness." (Aug. 21, 2017 Tr. at 136.)

{¶ 43} Weisman was also presented with the summary obtained from interviewing another one of Montgomery's former girlfriends, C.D., who stated that when their son was three months old Montgomery "hit her for the first time. She recalled how [he] hit her in the head with a closed fist and knocked her to the floor. She felt her brain shake." On another day, Montgomery "slammed her to the floor and choked her until she passed out." When she "came to," C.D. saw Montgomery "pacing back and forth over her and talking to himself," and she realized "there was something wrong with him." C.D. "said she got daily beatings and went to work with bruises." (Aug. 21, 2017 Tr. at 137.) Another time, Montgomery "was so drunk and high that he was driving her Blazer with a flat tire." When she told him to leave, "he beat her to a pulp." Montgomery "slammed her to the floor and choked her until her daughter came down and jumped [on] his back and bit him in the ear." C.D.'s son called 9-1-1, "but it took about 45 minutes for the police to arrive," all while he "continued beating her." Montgomery "always made excuses. He never took responsibility." He "would blame her when he beat her." (Aug. 21, 2017 Tr. at 138.) Montgomery wrecked two of C.D.'s cars. One time he "started punching her while she was driving," and "he also smashed the windshield with a beer bottle while she was driving." (Aug. 21, 2017 Tr. at 139.) When asked if this "serial domestic abuse" showed why he "wouldn't have wanted to call" C.D. as a witness, Weisman agreed stating "[t]hat's a correct statement." (Aug. 21, 2017 Tr. at 140.)

{¶ 44} Another girlfriend, L.H., reported that Montgomery "would sing while he was whopping" their son. He "wanted to use extension cords and switches to whip" the child, but "she didn't want this." Weisman agreed this would have been evidence of Montgomery's "willingness to commit domestic abuse against children" if he called L.H. to testify. (Aug. 21, 2017 Tr. at 141.)

{¶ 45} Weisman stated they requested funds for Dr. Fradkin because they "were thinking about" PTSD as a mitigation topic, and "the effects that would have had on him, the trauma from sexual abuse as a child." (Aug. 21, 2017 Tr. at 104-05.) However, they decided not to "push that agenda." (Aug. 21, 2017 Tr. at 105.) He did concede that Dr. Fradkin's report would have helped support the theme that "the system [failed] to protect him" as a juvenile, and would have helped "explain to the finders of fact how" the sexual abuse he "suffered as a young boy influenced his later behavior." (Aug. 21, 2017 Tr. at 177, 182.)

{¶ 46} Weisman had Dr. Fradkin's report before going to mitigation, but a section of it recounting that Montgomery had "talked some about the day he committed the murders" provided reasons not to call him as a witness. "He said it 'just happened.' He was on probation, was doing good, had been going to domestic violence classes, and was not drinking or doing drugs. He said his girlfriend Tia was seeing other guys, and he told her he could leave. She said, 'How would the bills get paid?' She wanted to get married, but he felt she was misleading him with her selfish needs. He said, I told her, 'Don't fuck with me.' " Montgomery reported "that day everything from his past surfaced that he had blocked out. He said he was angry about life and angry how nobody else got in trouble but he did." (Aug. 21, 2017 Tr. at 149.) Dr. Fradkin's report continued: "He told me he was actually having sex with both Tia and [X.X.]. He said he had sex with [X.X.] to get revenge on Tia for the times she was having sex with other men. He felt she had done him dirty, so he felt justified to do her wrong. [X.X.] had written an anonymous letter to Tia, and [Montgomery] figured out it must have come from [X.X.] because she wanted them to break up. * * * He had also gone to [X.X.] numerous times when he felt hurt by Tia. Before he killed Tia, he told her he had anal sex with [X.X.]." (Aug. 21, 2017 Tr. at 150.)

{¶ 47} Weisman agreed, in the words of the prosecutor on cross-examination, that these details "can be interpreted as indicating" that Montgomery "was seeking revenge in some way against Tia" and "that he taunted her about anal sex with [X.X.] before he killed

her." (Aug. 21, 2017 Tr. at 151.) "Those would have been reasons not to call Dr. Fradkin," he conceded. "Like many of the other witnesses, I think they offered more negative -- there were more negatives than positives to put them on the stand. So, yes, [the details in the report] would be why." (Aug. 21, 2017 Tr. at 152.)

{¶ 48} Dorian Hall, the supervisor of mitigation and fact investigation at the Ohio Public Defender's Office ("OPD"), offered her thoughts on the mitigation investigation and presentation. She reviewed Dr. Stinson's report and opined that although it "was very well laid out" and "hit all the key concepts," the defense did not adequately present the "psychology assessments" within it. (Aug. 21, 2017 Tr. at 229-30.) Although the sexual abuse was "mention[ed] in the opening" statement of the mitigation hearing, she contended the defense had "show[n] no documentation" of it nor called "an expert [to] talk about the significance of being sexually abused and particularly without getting any counseling." (Aug. 21, 2017 Tr. at 231.)

{¶ 49} Likewise, the report's theme of "parental abandonment and neglect" was "touched upon" at the hearing, but the "details were not fully developed" and "there wasn't an expert [called] who could talk about the impact of abandonment and rejection and poor parenting." (Aug. 21, 2017 Tr. at 232.) Hall made the same criticism of the defense's presentation of the family history of substance abuse and stated: "it wasn't explained and talked about." (Aug. 21, 2017 Tr. at 233-34.) Based on "tidbits of information" from "family members and friends talking about how he behaved oddly and some of his behaviors and how he acted when he was consuming alcohol," Hall believed that dissociation "definitely" should have been investigated and presented. (Aug. 21, 2017 Tr. at 234.) It was also her opinion that PTSD "should have been investigated and developed." When asked, she agreed that substance abuse, dissociation, and PTSD all required "expert testimony to fully explain the impact of those things on Mr. Montgomery." (Aug. 21, 2017 Tr. at 235.)

{¶ 50} Hall faulted the evidence presented at the mitigation hearing for its lack of detail, critiquing the presentation of "themes that weren't fully developed" and the lack of "experts that could explain the impact of those events and explain who Mr. Montgomery was." (Aug. 21, 2017 Tr. at 236.) Hall also noted that an expert could have testified about "the failure of the system" into which Montgomery was placed as a juvenile. (Aug. 21, 2017 Tr. at 238.) Hall supervised Heiby, the OPD mitigation specialist and investigator who

worked on Montgomery's case; Hall deemed Heiby's work "adequate." (Aug. 21, 2017 Tr. at 247-48.)

{¶ 51} Dr. Fradkin specializes "in trauma and specifically in men's trauma." (Aug. 23, 2017 Tr. at 263.) He described a "shift" in his field that has recognized men as victims of trauma and placed increasing value over the last five to ten years on "trauma-informed therapy." (Aug. 23, 2017 Tr. at 265-66.) Dr. Fradkin was retained by Montgomery's original defense team in 2011; he was asked to evaluate Montgomery "on the sexual trauma that he experienced," and to write a report on his findings. (Aug. 23, 2017 Tr. at 266-67.) Initially, Dixon was the "only person" from the defense team who met with Dr. Fradkin who was not aware the team had a mitigation specialist. (Aug. 23, 2017 Tr. at 268-69.) With Dixon present, he spent one and one-quarter hours interviewing Montgomery. He found Montgomery "forthcoming" and "willing to be vulnerable," but acknowledged that a "best practice would be" to interview Montgomery alone; he had believed at the time that the attorney's presence "was required" for a defendant in the jail. (Aug. 23, 2017 Tr. at 362; 272.) Since then, he has never met "just once" with a defendant because he believes it is not "appropriate" to broach the subject of sexual abuse during an initial interview: "I think it's necessary to establish a relationship with the client as is true for any trauma-informed kind of therapy." (Aug. 23, 2017 Tr. at 273.) After interviewing Montgomery and preparing a report, Dr. Stinson informed Dr. Fradkin that "he would incorporate the results of what [Dr. Fradkin] had written into his report" and that Dr. Fradkin would not be testifying. Dr. Fradkin received "no feedback" about his report from the defense attorneys. (Aug. 23, 2017 Tr. at 277.)

{¶ 52} After Montgomery's conviction, Dr. Fradkin was again asked to evaluate him. He reviewed records from "the psychological evaluations and the limited treatment" Montgomery received while at Franklin Village, hospital records, and treatment notes from a sex offender treatment program, as well as reports prepared by Dr. Stinson and Dr. James Reardon, a defense expert who had been retained after the conviction. (Aug. 23, 2017 Tr. at 280.) Dr. Fradkin interviewed Montgomery once in 2013 and "a number of times in 2017." (Aug. 23, 2017 Tr. at 281.) When interviewing him, Dr. Fradkin used the Forensic Experiential Trauma Interview ("FETI") technique, which was developed by a United States Army psychologist after the Ft. Hood shootings. (Aug. 23, 2017 Tr. at 282.) The FETI technique "asks questions about the sensory experiences of the experience" of trauma, such

as "what did you see and what did you hear and what did you smell, what did you think," based on the recognition that the brain remembers trauma "in pieces rather than in a sequence." (Aug. 23, 2017 Tr. at 283.) Dr. Fradkin also used the Adverse Childhood Experience ("ACE") assessment, which was developed based on research showing that "when somebody experiences even one Adverse Childhood Experience it's likely to have a life-long impact on their ability to function as an adult." Childhood trauma "is likely to impact on their health. People with many traumas tend to die earlier, and they tend to have many problems with intimacy, with functioning, with work, [and with] school." The ACE had been "well established" before Montgomery's conviction in 2012. (Aug. 23, 2017 Tr. at 284.)

{¶ 53} Montgomery's ACE score was six out of a possible ten. The score was based on the following experiences: having "an older person at least five years older" engage in sexual contact with him; abandonment by a biological parent, his father; witnessing his stepdad physically abuse his mother; living with "a problem drinker or an alcoholic" or drug user before the age of 18 (identified as "his mother, his father and his stepdad"); having a household member (mother and stepdad) who were "both depressed, mentally ill"; and being the "victim of physical and emotional neglect." (Aug. 23, 2017 Tr. at 286.) According to Dr. Fradkin, an ACE score of six is "very high. Only 3.7 percent of the population have a score of four or more." A high ACE score correlates with "drug and alcohol addiction," being "more likely to engage in sex early" in life, being "more likely to be violent, more likely to use drugs, more work absences, and much more likely to grow up with shame." (Aug. 23, 2017 Tr. at 287.)

{¶ 54} Dr. Fradkin used the FETI technique to interview Montgomery regarding four instances of sexual trauma. The first, "was when he was 3 or 4 years old, and he was gang raped by four boys." (Aug. 23, 2017 Tr. at 289.) The incident made Montgomery feel "like trash," and his mother "had very little reaction" after he went home and reported it to her. His stepdad, however, was "furious," and "they went and chased [the perpetrators] down" before going to the police to report the incident. The police stated Montgomery "was too young to testify in court, * * * so nothing was done." When asked what was "the most difficult part of this experience," Montgomery answered "that nothing happened, that it just went away." (Aug. 23, 2017 Tr. at 290.)

{¶ 55} The second incident occurred when Montgomery was "somewhere between 7 and 9," and was initiated by his "uncle's girlfriend's twin daughter," who was between the ages of 13 and 15. She "told him that his uncle had told her to take him into her room." Montgomery reported remembering feeling that the activity "probably wasn't right. He said that he didn't feel good about it, that he didn't know what was going on." (Aug. 23, 2017 Tr. at 292.) He "never told anyone until his girlfriend, [C.D.], decades later." The third incident occurred when he was 8 and "the girlfriend's daughter's sister," who was "12 or 13," was babysitting him when he "invited her to play house." (Aug. 23, 2017 Tr. at 293-94.) Dr. Fradkin interpreted the incident as indicative of Montgomery "basically learning that his value is to be a sex object," which was "a very problematic thing for an 8-year-old to be thinking." (Aug. 23, 2017 Tr. at 294-95.) The fourth incident occurred when Montgomery was "10 or 11," and the other person was a woman "in her forties." The woman "was drinking and was intoxicated." Although Montgomery "said, quote, unquote, we had sex," Dr. Fradkin cautioned that "this is something that male survivors tend to say about a sexual trauma. They describe it as sex even though she's in her forties; he's 10 or 11 years old. Clearly they're not having sex. She's sexually assaulting him." (Aug. 23, 2017 Tr. at 295.)

{¶ 56} Dr. Fradkin stated the postconviction interviews with Montgomery that employed the FETI technique resulted in "much more detail" than the pre-conviction interview. In 2012, he was "not aware of the FETI," because it had not yet been developed. (Aug. 23, 2017 Tr. at 296.) Dr. Fradkin emphasized the "extraordinarily shameful" feeling that male victims of sexual abuse experience and the fact that "on average men take 20 years from the time that they've been violated as a child before they're able to talk about it." (Aug. 23, 2017 Tr. at 297.) He described certain "signs" of "self-defeating kinds of behaviors" in Montgomery's history that, in his experience, were indicative of unreported and untreated sexual abuse, including starting to drink at the age of 9 and "daily use of alcohol at age 17 or 18 [that] continued until he was imprisoned"; daily use of marijuana as a teenager; use of drugs such as ecstasy, Percocet, and cocaine; an eating disorder that manifested as "overeating tremendously," resulting in a weight of 200 pounds at the age of 11 and bullying at school; bedwetting from age 4 or 5 until 12 or 13; "sexual acting out" with "a lot of boys and girls who were smaller, inferior, or less powerful than him," as well as "with female teachers, with staff." (Aug. 23, 2017 Tr. at 298-301.) Dr. Fradkin described

these as "incidents of sexually reactive experiences rather than that he was a sexual perpetrator," disagreeing with Franklin Village records that presented Montgomery "as more predatory." (Aug. 23, 2017 Tr. at 302.)

{¶ 57} According to Dr. Fradkin, Montgomery was offered "grossly inadequate treatment" for "both the sexual trauma as well as the other traumas" he experienced. (Aug. 23, 2017 Tr. at 309-10.) He was "misdiagnosed" with "Conduct Disorder," and "even when there were therapists who evaluated him and said that there was sexual trauma," there was no follow-up or treatment. As a juvenile, he was placed in a "sexual offenders group" in 1987 in which "sexual abuse was never talked about in any of" the 11 sessions Montgomery attended. (Aug. 23, 2017 Tr. at 309.) His mother "was generally resistant" to treatment, she "blamed him for a lot of her problems," and "actively encouraged him to not talk about the traumas that he experienced." (Aug. 23, 2017 Tr. at 313-14.) Dr. Fradkin opined that this "add[ed] to his trauma." Nevertheless, Montgomery told him "he felt like she was a pretty good mother," which Dr. Fradkin attributed to his observation "that survivors learn to be loyal to dysfunction." (Aug. 23, 2017 Tr. at 314.)

{¶ 58} When Montgomery was released from Franklin Village it was recommended he be committed to the Department of Youth Services based on the diagnosis "that he had a Conduct Disorder and he was unruly and he needed a stricter environment to live in." (Aug. 23, 2017 Tr. at 316.) The records Dr. Fradkin reviewed indicated that the clinical director of a residential treatment facility that rejected him for placement believed commitment would result in "an increase in his anxiety level" that was intended to "increase his motivation for change" and make Montgomery "more responsive to treatment." (Aug. 23, 2017 Tr. at 317.) Dr. Fradkin opined that "from a trauma-informed perspective, that would be the worst thing you would want to do, * * * increasing anxiety is more likely to lead to disconnection." (Aug. 23, 2017 Tr. at 317-18.)

{¶ 59} Dr. Fradkin described dissociation as "an experience in which a person is not fully in touch with what's going on in the current situation because of the trauma [and] a defense mechanism." In Montgomery's case, "one of the signs of dissociation was that he heard voices inside [of] his head." (Aug. 23, 2017 Tr. at 323.) In addition, "losing time, using a different voice, losing control over your body are all other examples of dissociative kinds of symptoms." (Aug. 23, 2017 Tr. at 323-24.) Dr. Fradkin attributed Montgomery's "compulsive sexual behavior" as a teenager and "problems with emotional avoidance that

resulted in escalating conflicts with his partners [as the] result of the trauma that [he] suffered that he did not receive sufficient treatment for."  (Aug. 23, 2017 Tr. at 324-25.)

{¶ 60} Dr. Fradkin acknowledged he would not have been able to use the FETI interview technique for the original mitigation proceeding because it had not yet been developed.  He "believe[d]" his "analysis and conclusions" might have been "different based upon not having FETI available."  (Aug. 23, 2017 Tr. at 322.)  He also acknowledged he did not "specifically" know the percentage of child victims of sexual abuse who grow up to commit murders, but that it was "relatively small."  (Aug. 23, 2017 Tr. at 332.) Dr. Fradkin believed there was a "causal connection" between Montgomery's untreated trauma and his "self-defeating" and "violent behaviors in his case to deal with the feelings of being overwhelmed, * * * stressed [and] betrayed," such as the betrayal he felt when Tia had "affairs with other people, other men."  (Aug. 23, 2017 Tr. at 333.)

{¶ 61} Dr. Fradkin also acknowledged there was "ample evidence" of instances in the record of Montgomery "minimizing" and, in the words of the prosecutor, "lying over and over and over again," but he opined this is "very common with survivors of sexual trauma and other trauma," and "especially an African-American male who's brought up in a culture where he's supposed to be strong and powerful."  (Aug. 23, 2017 Tr. at 252-53.) Dr. Fradkin believed at the time of his initial interview with Montgomery that it had been sufficient to investigate the sexual abuse and that Montgomery had been quite open with him, but in his postconviction testimony, Dr. Fradkin expressed different views and agreed he had been "inexperienced" in interviewing criminal defendants.  (Aug. 23, 2017 Tr. at 361.)  At the time, he did not know that it would "be appropriate" to ask for Montgomery's records or request to interview him without his attorney present. (Aug. 23, 2017 Tr. at 361-62.)

{¶ 62} When read the definition of Antisocial Personality Disorder in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Dr. Fradkin acknowledged that many of the factors applied to Montgomery and that his "antisocial behaviors" were "well documented in the psychological reports."  However, he believed such behaviors were "a result of the untreated trauma and that it's a trauma-uninformed approach to slap that label on him because it doesn't take into account the experience he had and the lack of support he had and the lack of treatment he had." (Aug. 23, 2017 Tr. at 374.)

{¶ 63} Dr. James Reardon is a psychologist with 33 years of experience in "Post-Traumatic Stress and trauma-related disorders" and forensic psychology. (Aug. 23, 2017 Tr. at 397.) He first examined Montgomery in 2013 after the conviction. Most of the records and investigative information he reviewed were provided by investigators at the OPD's office, but he did conduct a "face-to-face interview" with C.D. because she "had been in a relationship with Montgomery for a significant period of time [and] had a son with Mr. Montgomery." (Aug. 23, 2017 Tr. at 408-09.) He also prepared a supplemental report in 2017 based on "additional records" and subsequent consultation with Montgomery. (Aug. 23, 2017 Tr. at 409.)

{¶ 64} When asked if Montgomery had ever "received any sort of effective treatment focused on sexual abuse victims or being a sexual abuse survivor," Dr. Reardon stated he saw "no evidence" that "it ever was effectively addressed." He acknowledged "there were a number of people that treated him that meant well" and "in all fairness" Montgomery "didn't really want to talk about it. Most victims and survivors don't want to talk about it." (Aug. 23, 2017 Tr. at 417.)

{¶ 65} Based on his review of Montgomery's juvenile and hospital records, Dr. Reardon believed he "had been physically abused and neglected through most of his childhood." Hospital records showed he had been "burned with an iron. He fell down stairs. He had a cut on his face." (Aug. 23, 2017 Tr. at 419.) Dr. Reardon believed Montgomery's mother "loved him, but I don't think she ever liked him," and she "blamed him for ruining her life." She "washed her hands of him and just gave him over to the juvenile system" when he was 12. (Aug. 23, 2017 Tr. at 420.) Dr. Reardon saw evidence that Montgomery's mother "drank every day reportedly throughout the time that he was being carried," indicating a "potential" for fetal alcohol syndrome. (Aug. 23, 2017 Tr. at 420-21.) "Both his father and step[dad] sold drugs [and] did drugs." In addition to his mother's drinking, Montgomery "smoked his first blunt with his mom when he was around 8 years old [and] he drank with her * * * from an early age on." (Aug. 23, 2017 Tr. at 421.) Montgomery "went to eight or ten different elementary schools before he even got past the eighth grade." (Aug. 23, 2017 Tr. at 421-22.)

{¶ 66} Dr. Reardon diagnosed Montgomery with "Post-Traumatic Stress Disorder Reaction, undiagnosed, untreated, from the abuses that were perpetrated on him, beginning with the episode or the situation when the four boys sexually assaulted him when

he was 4 years old and then moving forward from that point." (Aug. 23, 2017 Tr. at 422-23.) Dr. Reardon opined that "ultimately people in the juvenile system largely ended up blaming" Montgomery and treating him "more as somebody who had been a perpetrator or a potential somebody who didn't know how to handle boundaries and limits and things like that rather than somebody who had this trauma exposure in his background." (Aug. 23, 2017 Tr. at 440.) Dr. Reardon discussed a psychiatric record from 1986 prepared when Montgomery was 11 years old. The report described him as having "a long history of misconduct and borderline hyperactivity," "poor socialization skills, lack of discipline, poor motivation, total denial of problems," but had no indication that the psychiatrist was aware of "the sexual abuse events" Montgomery had experienced. (Aug. 23, 2017 Tr. at 443.) Dr. Reardon disagreed with the report's diagnosis of Conduct Disorder. Although he acknowledged "conduct difficulties," Dr. Reardon "would have diagnosed him with Post-Traumatic Stress Disorder with Conduct Disorder Manifestation," based on "the connection between the trauma exposures and the trauma effects and the behavioral manifestations." (Aug. 23, 2017 Tr. at 447-48.)

{¶ 67} Dr. Reardon believed that "an attempt to arrive at an Antisocial Personality Disorder diagnosis" of Montgomery was "flawed because of all the information that was there and available that was never presented" and because he did not think Montgomery "me[t] the criteria for that." (Aug. 23, 2017 Tr. at 450.)

{¶ 68} Dr. Reardon opined the trauma Montgomery experienced resulted in him developing the following "coping mechanisms:" "[d]enial, minimization, avoidance, hyperreactivity, extreme difficulty in modulating emotional reactions, especially in situations where he feels abandoned," and substance abuse. (Aug. 23, 2017 Tr. at 452-53.) He agreed that dissociation was a coping mechanism, but clarified that "the catch with dissociation is it's not a consciously employed coping mechanism." (Aug. 23, 2017 Tr. at 455.) It is "something that occurs, not something that a person consciously employs." (Aug. 23, 2017 Tr. at 456.)

{¶ 69} Dr. Reardon diagnosed Montgomery with PTSD with dissociative episodes. He believed that on the day of the murders, Montgomery "was in a highly dissociated state." (Aug. 23, 2017 Tr. at 460.) Dr. Reardon "[a]bsolutely" believed Montgomery had "dissociated multiple times throughout his life." He described the relationship with C.D. as "independently corroborating" that Montgomery's dissociative "episodes had happened

before." (Aug. 23, 2017 Tr. at 466.) According to Dr. Reardon, C.D. "described a number of episodes" during which Montgomery "went away, said his eyes glazed over, he went away, he got physical with her," and the "main one was the last one where she did file domestic violence charges against him." (Aug. 23, 2017 Tr. at 468.) She described two other episodes: one in which "she kind of came to after he had kind of choked her and then let go, and he was pacing back and forth and talking to himself like he was having a conversation," and another in which "he had actually bit her on the cheek, and when the blood trickled down her cheek, * * * she saw his eyes kind of focus on it, and he kind of snapped to and asked her, 'What happened? What happened? How did you get cut?' " (Aug. 23, 2017 Tr. at 469.) In both situations, Montgomery "[h]ad no memory" of having assaulted her. Dr. Reardon opined he did "not believe that in a non-dissociated state Caron Montgomery would have been psychologically capable" of murdering Tia, Tahlia, and Tyron. (Aug. 23, 2017 Tr. at 470.)

{¶ 70} Montgomery reported to Dr. Reardon that he had "smoked some marijuana" that evening and "he was upset that Tia had left the two children there by themselves." (Sept. 5, 2017 Tr. at 1061-62.) These events were what Dr. Reardon described as the "bits and pieces" of what occurred that Montgomery reported remembering. (Sept. 5, 2017 Tr. at 1063-64.) Dr. Reardon stated it is "very difficult" to "parse out" a dissociated person's actual memories of events from "what they recall because somebody else has provided the information," as the "information just sort of blends." (Sept. 5, 2017 Tr. at 1065.) When informed that Montgomery "was using crack cocaine and alcohol along with marijuana," Dr. Reardon stated "the drugs played a fairly minimal role in any actions, any emotional reactions that Montgomery had." (Sept. 5, 2017 Tr. at 1067.)

{¶ 71} Montgomery reported to Dr. Reardon that he "just went away," and the next thing he was able to recall "was that * * * he kind of came back," and everyone was dead. (Sept. 5, 2017 Tr. at 1068-69.) He stated "he looked at his hands. His hands were cut up. He said there was blood everywhere. * * * He just had no recall, period." (Sept. 5, 2017 Tr. at 1069.) After that, Montgomery "took a shower," then "took Tia's car, drove back out to the west side, got some more drugs, came back to the apartment [and] did the drugs." The "sound of the police" was the "next thing he really remembered, which in reality was recalled from his own experience." (Sept. 5, 2017 Tr. at 1070.)

{¶ 72} Dr. Reardon emphasized that Montgomery "went back to the same apartment" instead of fleeing. "He could have gone anywhere. He didn't. * * * He didn't really have an explanation of why he did that." (Sept. 5, 2017 Tr. at 1070.) Dr. Reardon believed that Montgomery "couldn't leave them. Even though he knew they were dead, he was still connected to them." Dr. Reardon pointed out that "a rational murderer at that point would leave." There was "roughly a 30- to 35-hour span of time" between the murders until "the police came to the apartment [during which] he has no recollection of what he did." (Sept. 5, 2017 Tr. at 1071.)

{¶ 73} Dr. Reardon described dissociation as "a way of escaping when there's no escape. The mind simply shuts down psychologically when there's no escape physically from the situation or the circumstances." (Sept. 5, 2017 Tr. at 1073.) He rejected the notion that it was "convenient" or the product of free will: "it's not something that you do. It's something that people experience." (Sept. 5, 2017 Tr. at 1072-73.) Dr. Reardon recounted other times that Montgomery's description of his experiences indicated dissociation, including the sexual assault at the age of four, and when he physically assaulted C.D. "with no recall of having gone into that state at the time." (Sept. 5, 2017 Tr. at 1073-74.)

{¶ 74} Dr. Reardon acknowledged during cross-examination he had read the summary of the interview with T.L. recounting that Montgomery had threatened to kill her and her children. His reaction was that Montgomery probably was not "a strong candidate for father of the year." (Sept. 5, 2017 Tr. at 1084.) Dr. Reardon later conceded that Montgomery "engaged in, without question, * * * probably numerous situations where he lost to varying degrees control and engaged in very maladaptive and destructive behavior towards the women that he was involved with." (Sept. 5, 2017 Tr. at 1086.) He agreed with the characterization of Montgomery as "a repeated domestic abuser" and that the original mitigation investigator's summary reported that C.D. had stated Montgomery beat her daily, although she did not say that to Dr. Reardon. (Sept. 5, 2017 Tr. at 1086-87.) Dr. Reardon did not believe that Montgomery would "have been dissociated during all of these incidents of [domestic] abuse," as the phenomenon "typically comes into play in the most difficult emotional circumstances." (Sept. 5, 2017 Tr. at 1087.)

{¶ 75} Significantly, Dr. Reardon's testimony elaborated on cross-examination with regard to what Montgomery recalled about the night in question: "What he said was, I was in and out a little bit in the hallway; stabbed Tia in the eye; none of it seemed real; felt like

I just snapped and lost it." Asked "[s]o he did remember part of the killing," Dr. Reardon answered: "He reported it to me. I don't know that he remembered it or didn't. Like I said, in my opinion, it would be very unusual. People don't go from a dissociated state to a lucid state and back and forth." (Sept. 5, 2017 Tr. at 1109.) Asked again "[w]ell, he remember[ed] stabbing Tia in his first interview," Dr. Reardon again responded: "He reported that to me." (Sept. 5, 2017 Tr. at 1110.)

{¶ 76} Dr. Reardon opined that the "gruesomeness" of Montgomery's "horrible" crimes was "relevant" because "either you had to be really, really cold-blooded to do something like that [and] had to know exactly what you were doing * * * or you had to be really gone, out of control." (Sept. 5, 2017 Tr. at 1118-19.) He considered C.D.'s opinion that "she could see [Montgomery] going off on Tia, but [could not] in a million years see him killing his own son in the way that his son was killed" as "either powerful evidence that he's got us all fooled, and he knew exactly what he was doing, * * * or that he was in a highly dissociated state, [and] completely lost control" emotionally. In Dr. Reardon's opinion, it was the latter: "To me, that's powerful evidence that weighs in favor of him being in an incredibly dissociated state." (Sept. 5, 2017 Tr. at 1119.)

{¶ 77} Dr. Reardon found it unsurprising that Montgomery "covered the faces of his victims" after killing them because "he probably couldn't bear to see their faces." (Sept. 5, 2017 Tr. at 1119-20.) When asked about the fact that Montgomery "hid" Tia's car by parking it "at some distance away from her apartment building" after the murders, Dr. Reardon responded that this fact did not change his opinion about Montgomery's mental state: "if he's going to hide the car away, why did he stay there? Again, that's not what a logical murderer does." (Sept. 5, 2017 Tr. at 1120.)

{¶ 78} Dr. Stinson also testified at the postconviction hearing. He has served as a mitigation specialist in "a dozen or more" capital cases, including Montgomery's initial case. (Aug. 24, 2017 Tr. at 488.) He describes his role in a capital case as advising "the attorneys on psychological factors that can be of mitigating value should the case ultimately get to a mitigation phase." (Aug. 24, 2017 Tr. at 489.) Dr. Stinson met with Montgomery five times, with "eight hours of actual face-to-face time," in 2011 and 2012. (Aug. 24, 2017 Tr. at 494-95.) After his first meeting with Montgomery, Dr. Stinson flagged his "sex abuse history" as "an important mitigating factor" and "passed it along to the attorneys" with a recommendation that "they should enlist an expert in that area." (Aug. 24, 2017 Tr. at 498.)

After "researching who would be the most suitable expert," Dr. Stinson recommended Dr. Fradkin to the attorneys. (Aug. 24, 2017 Tr. at 499.) After speaking with Dr. Fradkin, Dr. Stinson believed the sexual abuse history "was significant" and "communicated * * * to both attorneys" that it was mitigating evidence that should be presented in court. (Aug. 24, 2017 Tr. at 500-01.) He also recommended a substance abuse expert based on the "strong family history of substance abuse," but such an expert was not retained. (Aug. 24, 2017 Tr. at 501.)

{¶ 79} At a strategy meeting with the attorneys and the mitigation specialist, Dr. Stinson suggested that "Dr. Fradkin would be an expert on the sex abuse issues" and their "impact on a person's development and behavior," and that a substance abuse expert "could talk about the impact of drugs on brain development and the impact on subsequent behaviors," and he would be "a kind of general mitigation psychologist who would kind of put it all together." (Aug. 24, 2017 Tr. at 503.)

{¶ 80} Dr. Stinson reviewed the report he prepared in 2012 which discussed the following mitigation factors: the developmental effect "of being exposed to drugs and alcohol in utero"; a family history of alcohol and substance abuse; family history of mental problems, as the children of mothers with psychiatric conditions "are likely to have some adverse developmental experiences"; "inadequate parenting," resulting in difficulties with "internal self-control, and that gets manifested in behavior problems through childhood, adolescence, and into adulthood," and emphasizing Montgomery's mother's record of "ineffectiveness at supporting the interventions that were being offered" or "sabotaging the efforts that were being put in place"; a childhood history of "witnessing domestic violence," resulting in "emotional problems [that] manifest behaviorally"; physical abuse and neglect, which also adversely impacts "emotional development, which gets manifest behaviorally"; a history of sexual abuse, for which Dr. Stinson "strongly encouraged bringing Dr. Fradkin on" to investigate; a history of "mental health * * * disorders," including Montgomery's diagnosis of depressive disorder, which presents as "irritability, which will manifest as anger and behavioral dyscontrol"; substance abuse problems, which Dr. Stinson believed "were strong mitigating factors" because Montgomery was "genetically predisposed" to them, as well as being "socially predisposed because he saw family members using" and introducing him to substance abuse; a history of "multiple head injuries," that Dr. Stinson opined would "have an adverse impact on his emotions and behaviors"; "residential mobility" due to "moving around a lot as a child" and "school instability," which is "an

increased risk factor for drug and alcohol use, for academic failure, for legal problems"; a relatively stable employment history, which Dr. Stinson believed showed that Montgomery had "the ability under the right circumstances * * * to be productive and to be effective"; Montgomery's relationship with his children, as Dr. Stinson believed it was important "to point out that he had, in fact, tried to provide for his children, and his children perceived that they needed him in their lives"; and Montgomery's positive "adjustment to a structured setting of incarceration," which Dr. Stinson believed was "a strong mitigating factor." (Aug. 24, 2017 Tr. at 509-23.)

{¶ 81} Dr. Stinson described the report he prepares as disclosing only "the general content, kind of an outline of what the content" of testimony will be, "and then the testimony [will] provide the opportunity to really share my expertise as a psychologist." He opined the report alone, "absent testimony," will not convey "the full details and the full context." (Aug. 24, 2017 Tr. at 524.) After submitting his mitigation report to Montgomery's attorneys and subsequently meeting with them, he "anticipated that [he] would be testifying at mitigation." (Aug. 24, 2017 Tr. at 528.) By May 5, 2012, he was "getting ready for testimony" by preparing a PowerPoint exhibit and organizing his files. On May 14, 2012, Dr. Stinson was informed he "would not be called as a witness." (Aug. 24, 2017 Tr. at 529.)

{¶ 82} At the request of the OPD, Dr. Stinson conducted postconviction investigations and prepared reports summarizing his findings. Although he discovered "greater detail" concerning Montgomery's incarceration, he did not "uncover brand-new topics of mitigation" or "anything significantly new" to report. (Aug. 24, 2017 Tr. at 535-37.)

{¶ 83} Dr. Stinson agreed that if he had been called to testify at Montgomery's original mitigation hearing, he "would * * * have been able to testify to mitigating evidence," and "[w]ould * * * have been able to cite to factual sources" and "psychological literature or medical literature" that supported his opinions. He also agreed that "it [is] necessary to present both psychological testimony and fact witnesses' testimony in order to present a coherent, compelling mitigation narrative." (Aug. 24, 2017 Tr. at 538.) Dr. Stinson opined that without both lay and expert testimony, "you don't get a complete picture." Fact testimony alone "just tells you, you know, what has happened, but it doesn't give you any explanation for what that means in terms of child and adolescent development, adult behavior." There is no "information" regarding the way the facts "impact on brain

development" or "affect interpersonal relationships. * * *  [W]ithout that extra scientific understanding of the impact of the factual information, I think you don't get the mitigating value.  You just get, you know, facts and information."  (Aug. 24, 2017 Tr. at 539.)

{¶ 84}  Gwendolyn Turner, an FCCS caseworker who was assigned to Montgomery's family's case in the 1980's, also testified.  FCCS "became involved" with the Montgomery family "because the mother was employed at the time and was having issues with child care, and she was leaving him alone in the car when she would go to work."  Eventually, "other allegations came out of a sexual abuse nature."  (Aug. 24, 2017 Tr. at 585.)  The allegations concerned "three male juveniles," and no police report was made or counseling received by the family.  Montgomery's mother, Carol, reported to Turner that he "had actually been molested by an adult male that was not reported" and vowed to deny the accusation if Turner reported it to anyone.  Carol's plan was to find a deceased person in the obituaries of the paper who "resembled the person that reportedly had molested" Montgomery so that she could "show him the picture and basically say, 'See?  He got his.  It's over.  Your life can go on.  He can't hurt you or anybody else.' "  (Aug. 24, 2017 Tr. at 586.)

{¶ 85}  Turner believed that Carol "was attempting to provide housing and the basic needs for her child," but she "was really struggling."  Turner "felt that she was a loving and caring mother but that they had secrets."  (Aug. 24, 2017 Tr. at 587.)  After the disclosure of the molestation, Turner recommended Montgomery "really need[s] to be in counseling" and be involved in "extracurricular activities" like sports to expose him to other children, but Carol was "resistive to all of that."  (Aug. 24, 2017 Tr. at 588.)  Carol "was not cooperative at all" with Turner's case plan, and the "lack of cooperation" and Montgomery "being left alone" resulted in his placement at Franklin Village as a juvenile.  (Aug. 24, 2017 Tr. at 588-89.)  Carol "flip-flopped a lot" about admitting that Montgomery engaged in "negative behaviors," and would "always" blame the molestation for his behaviors but remain resistant to counseling.  (Aug. 24, 2017 Tr. at 590.)  After Montgomery was placed in Franklin Village, there were times he was eligible to come home for weekends or holidays but Carol would "frequently make up excuses as to why he couldn't come home" or would not pick him up.  (Aug. 24, 2017 Tr. at 591.)

{¶ 86}  Turner received reports from Franklin Village that Montgomery "was very withdrawn, not interacting well with the rest of the kids," and engaged in "minor fights."  (Aug. 24, 2017 Tr. at 599.)  She was "somewhat surprised" when he was placed in the sex

offender program there, as she "never had information that he had perpetrator tendencies"; she believed it was a result of "the unresolved sexual molestation that he never resolved in counseling." (Aug. 24, 2017 Tr. at 599-600.) The family's case was eventually closed "for lack of cooperation." (Aug. 24, 2017 Tr. at 601.) On cross, Turner acknowledged Montgomery's history of "serious behavioral problems" at Franklin Village, including sexually acting out, fighting, and running away. (Aug. 24, 2017 Tr. at 613-15.)

{¶ 87} C.D.'s son, C.X.D., lived with Montgomery when the latter was dating his mother. During the years he lived with Montgomery, he considered him "a second father in a way." Montgomery helped him with homework and they would spend time together on the weekends "playing video games or just hanging out." (Aug. 24, 2017 Tr. at 634.) Montgomery treated C.X.D. like his own son, and C.X.D. agreed that he loved Montgomery like a father. (Aug. 24, 2017 Tr. at 636.)

{¶ 88} C.X.D. witnessed his mother and Montgomery fighting, both physically and verbally. Whenever he would see "a situation escalating," he would "try not to be around" and "make sure that the [other] kids were not around, if that was to happen." (Aug. 24, 2017 Tr. at 638.) C.X.D. saw Montgomery "acting violently" at times, precipitated by "verbal arguments" between his mother and Montgomery, who "would snap or just go * * * crazy" and "would lose it." He stated Montgomery drank on the weekends and smoked marijuana "[h]eavily." (Aug. 24, 2017 Tr. at 639.)

{¶ 89} C.X.D. recalled "two really bad episodes." (Aug. 24, 2017 Tr. at 639.) The first occurred when he was "probably 12," when Montgomery arrived home in a vehicle with "a blown-out tire on the back right side," "came stumbling inside and then slammed the door," and "shortly after," C.X.D. heard arguing and the sound of "plates being tossed." He came downstairs and saw his mother and Montgomery "tangled up together" fighting, resulting in his mother having a "cut on her back side pretty bad." (Aug. 24, 2017 Tr. at 641.) Montgomery was "sweating a lot" and "looked delusional." (Aug. 24, 2017 Tr. at 642.)

{¶ 90} During the second incident, C.X.D. was in his room when the fight began. His mother "ended up putting [Montgomery] through a glass table," and she called police, who had to physically restrain Montgomery. (Aug. 24, 2017 Tr. at 642.) C.X.D. testified Montgomery never physically abused him or any of the children. (Aug. 24, 2017 Tr. at 643.)

{¶ 91} C.D. testified she and Montgomery were together for seven or eight years. Montgomery used alcohol and smoked marijuana, and he did so with his mother. He

physically abused C.D. "[m]aybe once, twice a month" during their relationship. During the "not-as-bad times," C.D. "would get shoved, you know, probably smacked down to the floor." She would "shove him back," but then try to stop if he would shove her harder. (Aug. 24, 2017 Tr. at 664.)

{¶ 92} During their relationship, there were probably "four or five" incidents of extreme abuse. C.D. recounted Montgomery "would, like, choke me, like, really choke me." Montgomery's "whole head would just, you know, shake," and "his eyes would get big." She recounted that "one of his eyes would look [in] the other direction just a little bit, * * * like a little cockeyed" and "crazy looking." (Aug. 24, 2017 Tr. at 665.) She described it as "a whole transformation." During the abuse, C.D. would be "trying to fight to breathe" and "saying his name out, like, oh, my God. Let me go. It was the most scariest thing I had ever seen in my life." (Aug. 24, 2017 Tr. at 665-66.) "It was like the lights were on and nobody was home." Montgomery would not respond to his name, and it appeared that "just a different person * * * was emerging. It was so scary." (Aug. 24, 2017 Tr. at 666.)

{¶ 93} The first time Montgomery choked C.D. she "passed out" and "was on the floor." While she "was waking up from being choked," she saw him standing over her, "and he was pacing, like, over back and forth on top" of her while "he was having a conversation with himself." (Aug. 24, 2017 Tr. at 666.) Montgomery "was talking to himself and answering his questions," each in "a different voice." (Aug. 24, 2017 Tr. at 667.) "He was going, 'I don't know why she made me do that. I don't know why she made me do that.' Then another voice came and said, 'She's crazy. You don't understand,' you know, doing some, like, crazy voices." C.D. stayed on the floor with her eyes closed out of fear that "he might choke [her] again." She peeked at Montgomery and saw that "[h]is face [was] doing all this distorted stuff" while "he was talking and answering questions back." (Aug. 24, 2017 Tr. at 667.) One voice was "like a squeaky pitched voice. The other one was more of a deeper voice." (Aug. 24, 2017 Tr. at 668.) When she saw Montgomery the next day, he did not seem to know what had happened. C.D. told him what happened and he gave her "a puzzled look," then shook his head, held her, and apologized. (Aug. 24, 2017 Tr. at 669.) At that point, C.D. realized "there was something wrong with him." (Aug. 24, 2017 Tr. at 670.)

{¶ 94} C.D. described another incident on a day that "was going good" until Montgomery had "an episode, like, out of nowhere." (Aug. 24, 2017 Tr. at 671.) Montgomery "snapped. He went into a rage." As C.D. tried "to get away," Montgomery

grabbed her. She could "see that thing happening again. His head was trembling" and his eyes were "all over the place; they were big." She protested that she could not breathe, but he seemed not to hear her. "Then he slammed [her] down to the floor, and he started choking [her]." (Aug. 24, 2017 Tr. at 672.) C.D.'s eight-year-old daughter "flew down the stairs," then "jumped on his back, and she bit his ear," at which point he "snapped out of it." (Aug. 24, 2017 Tr. at 672-73.)

{¶ 95} C.D. testified that Montgomery "was depressed," and "would talk to himself" using different voices. (Aug. 24, 2017 Tr. at 674.) She urged him to get help, but he did not, and "smoked weed" everyday instead. (Aug. 24, 2017 Tr. at 674, 676.) Montgomery told C.D. about two incidents of sexual abuse. She testified she would have told his trial attorneys or any experts about the sexual abuse if they had asked, and would also have testified.

{¶ 96} C.D. had been interviewed before the trial date, apparently by mitigation specialist Heiby. C.D. reviewed a report of the interview prepared by Heiby and contested some of its contents. C.D. stated that Montgomery "did not beat [her] every day. Okay? That did not happen." (Aug. 24, 2017 Tr. at 683.) She also stated she never used "the words 'higher than a kite' " or that Montgomery "didn't like [her] feeling empowered. I never said anything like that." (Aug. 24, 2017 Tr. at 684.)

{¶ 97} When cross-examined, C.D. agreed that when Montgomery choked her, he had "strangled" her to the point of unconsciousness; that she was "lucky [to be] alive when the police took too long to get there"; and that in the most extreme four or five incidents of abuse, she had been "worried about [her] life." (Aug. 24, 2017 Tr. at 692.) During another incident when Montgomery "had that rage," he "broke the wall" with C.D.'s body. (Aug. 24, 2017 Tr. at 693.) Montgomery hit her head "with a closed fist," knocked her "to the floor," and C.D. felt her "brain shake." (Aug. 24, 2017 Tr. at 700.) "[O]nce or twice," C.D. thought Montgomery might kill her. (Aug. 24, 2017 Tr. at 693.) She described as a "ballpark" figure Montgomery beating her once or twice a month. "There [were] times that he had that crazed look, and there were times that it was * * * just a regular, normal face." (Aug. 24, 2017 Tr. at 699.)

{¶ 98} Thomas, one of the Franklin Village employees who testified at Montgomery's original mitigation hearing, testified again during the postconviction hearing. She described meeting Montgomery's attorney after seeing the case on the news

and contacting the attorney. Thomas did not have access to Montgomery's psychological records at Franklin Village, so she did not discuss those issues with Montgomery's attorney.

{¶ 99} Brown, the other Franklin Village employee who had previously testified, also returned to testify at the postconviction hearing. Brown stated he had come forward to testify because he wanted the panel to hear how he remembered Montgomery as a juvenile, and that "[h]e was a great kid." (Sept. 5, 2017 Tr. at 1143.) When Brown worked there, he was not aware of Montgomery's history of sexual abuse, or any of the problems in his home life. Brown described several disturbing incidents at Franklin Village, including a child being sexually abused by an employee with no repercussions and "supervisors physically abusing kids." (Sept. 5, 2017 Tr. at 1150-52.) As at the original mitigation hearing, Brown had been "truly surprise[d]" to hear that Franklin Village records detailed Montgomery had discipline problems there. (Sept. 5, 2017 Tr. at 1165.)

{¶ 100} Major Paul Bryant, who has worked for the Franklin County Sheriff's Office for 20 years, supervised the "control area" of the main jail for 18 and one-half years where visitors are "cleared to come in." (Aug. 25, 2017 Tr. at 724-26.) He testified the standard policy was to log professional visits "both in the computer system and in the handwritten sign-in logs." (Aug. 25, 2017 Tr. at 730-31.) Major Bryant reviewed the visitation record for Montgomery from 2010 to 2012, which he considered the most accurate record of the visits Montgomery received, and stated it was "impossible" that Montgomery received "a dozen or more" professional visits that were not reflected on the record. (Aug. 25, 2017 Tr. at 733.)

{¶ 101} Donald Malarcik is a criminal defense attorney who is certified for death penalty representation and has pursued specialized training in that area since 1997. Malarcik considers the 2003 American Bar Association ("ABA"), guidelines for death penalty cases and the 2008 supplemental guidelines on mitigation to be "the prevailing standards and norms within the defense bar for capital litigants," and agreed that "any capital defense counsel would have read and been familiar" with both publications in 2011. (Aug. 25, 2017 Tr. at 754.) In his opinion, "these guidelines set the standard for the professional norms in capital representation." (Aug. 25, 2017 Tr. at 755.)

{¶ 102} Having reviewed the record of materials concerning Montgomery's trial representation, Malarcik opined that "the representation that he received fell well below the professional norms expected of counsel in capital cases." (Aug. 25, 2017 Tr. at 761.)

Malarcik faulted Montgomery's trial attorneys for not "developing a trust relationship" with their client, noting "there were large gaps of time where counsel did not see Mr. Montgomery." (Aug. 25, 2017 Tr. at 762-63.) He also criticized them for "not spend[ing] significant amounts of time necessary to develop a trust relationship with key mitigation witnesses," as indicated by Weisman's testimony that some of them met "for the first time the week before trial." (Aug. 25, 2017 Tr. at 763-64.) According to Malarcik, this led to a failure of witnesses to detail the family's problems with substance abuse and violence and an inaccurate portrayal of Montgomery's relationship with his mother. He considered this lapse "doubly damaging" because in addition to "not presenting key mitigation," what is presented instead is "a false picture." (Aug. 25, 2017 Tr. at 767.) Malarcik opined that the level of investigation and preparation did not satisfy the constitutional standards for the presentation of mitigating evidence set forth by the United States Supreme Court in *Wiggins v. Smith*, 539 U.S. 510 (2003), or *Skipper v. S. Carolina*, 476 U.S. 1 (1986). He stated his opinion was also based on trial counsel's failure to present jail records or testimony of correction officers to show that Montgomery had "adjusted well to incarcerated life," which he considered "compelling mitigation" evidence. (Aug. 25, 2017 Tr. at 769.)

{¶ 103} Malarcik contended that Montgomery's counsel was ineffective for not presenting the expert testimony of mental health experts during mitigation. He identified a number of "red flags" that he believed were indicative of the need for such testimony: Montgomery's report of "hearing voices," his anti-psychotic medication regimen, lay witnesses' reports of his "abnormal behavior," and his history of sexual abuse and substance abuse. (Aug. 25, 2017 Tr. at 776-78.) In Malarcik's opinion, expert testimony would "create a nexus between all of these acts, all of these facts, all of these activities and how they are and why they are compelling, strong mitigation." (Aug. 25, 2017 Tr. at 778.)

{¶ 104} In addition, Malarcik believed that Montgomery's trial counsel was ineffective during the mitigation presentation itself. He faulted Weisman for not emphasizing "Montgomery's acceptance of responsibility in his pleading guilty" as a theme. (Aug. 25, 2017 Tr. at 779.) He also criticized the attorneys for only mentioning Montgomery's childhood sexual abuse "in opening statement" and "during closing argument," with no "witnesses to talk about this sexual assault" and no "expert witnesses to talk about the effects of untreated sexually abused victims." (Aug. 25, 2017 Tr. at 779-

80.) Malarcik found it "concerning and troubling" that "the only evidence of the sexual assault of Montgomery came in through Joint Exhibit 1 and 2" and that "trial counsel initially objected to the admissibility of those records." (Aug. 25, 2017 Tr. at 780.) Malarcik was also critical of questioning witnesses as to whether they believed Montgomery was "a good person" because it opened the door to the admission of evidence of prior bad acts. (Aug. 25, 2017 Tr. at 784-85.) The defense had failed to file a motion in limine on that issue, and prosecutors were "able to question these witnesses about prior acts of physical violence * * * against women in his life and get into specific details of the facts of the Aggravated Murder." (Aug. 25, 2017 Tr. at 785.)

{¶ 105} Malarcik criticized the decision to waive a jury and present the mitigation case to a three-judge panel. Calling it "a mistake," he stated he would have "talk[ed] to the jury in voir dire," been "open and honest with them" about mitigation, with the goal of "maximiz[ing] the impact of your client's acceptance of responsibility." (Aug. 25, 2017 Tr. at 788.) He emphasized the ABA guidelines counsel not to "waive the jury without an agreement," and noted "statistics" that he said show capital defendants more regularly get life sentences from juries than from three-judge panels. (Aug. 25, 2017 Tr. at 789-90.)

{¶ 106} The defense also presented Dr. Clemens Bartollas, an expert in the juvenile justice system. By the late 1980's, the "pendulum had swung a hundred and eighty degrees from the rehabilitation [orientation] to [being] very punishment oriented." (Aug. 25, 2017 Tr. at 856.) Dr. Bartollas worked at and did studies at the maximum security juvenile facility Training Institute of Central Ohio ("TICO"), and performed "assessments" of the Training Center for Youth ("TCY") where Montgomery was housed. (Aug. 25, 2017 Tr. at 857-59.) Dr. Bartollas described an environment of dormitory housing where "younger kids were taken advantage of" by older children with inadequate oversight by staff. (Aug. 25, 2017 Tr. at 865-66.) From reports of residents, "TCY was as difficult as TICO." (Aug. 25, 2017 Tr. at 868.)

{¶ 107} After reviewing Montgomery's juvenile records, Dr. Bartollas opined the Franklin Village employees who testified at Montgomery's trial, Thomas and Brown, were "individuals [who] cared for [him], and they formed a relationship with him, and he responded to that." With "more of that type of support his response could have been much different." (Aug. 25, 2017 Tr. at 868.) In TICO, where Dr. Bartollas worked, staff members "frequently were involved in victimization," and there was a "mentality" that "was

particularly true of African-American staff with African-American inmates" that one had to "protect himself" and that "to be a man," one had to "stand up for yourself." (Aug. 25, 2017 Tr. at 869.)

{¶ 108} Dr. Bartollas opined that "the State did not do a good job" with Montgomery as a juvenile. (Aug. 25, 2017 Tr. at 870.) "In the late eighties, he would not have received effective treatment anywhere for being a sexual [abuse] victim. That was not considered at that time." (Aug. 25, 2017 Tr. at 872.) The sexual perpetrator programs in existence then would not have "effectively counseled" Montgomery, as they were just "starting to develop" and "were not sophisticated." (Aug. 25, 2017 Tr. at 873.) Dr. Bartollas disagreed with a request in the records prepared by FCCS asking to have Montgomery placed in a more secure juvenile facility in order to "increase * * * his anxiety level" to make him "more responsive to treatment." (Aug. 25, 2017 Tr. at 875-76.) According to Dr. Bartollas, with "the most-difficult-to-handle kids," increasing anxiety would "reduce their performance"; hence, the goal was "to reduce anxiety, not increase it." (Aug. 25, 2017 Tr. at 876.) In his opinion, Montgomery "needed support," not a "punishment-related system" like the one he was housed in. (Aug. 25, 2017 Tr. at 876-77.)

{¶ 109} Montgomery also testified on his own behalf. He described the sexual assault he experienced when he was four, as well as the subsequent experiences. (Sept. 5, 2017 Tr. at 962-64.) He also described his mother hitting him "with an extension cord or a switch" whenever he "got into trouble," which he said happened "once or twice a week." (Sept. 5, 2017 Tr. at 965.) He described being sent to Franklin Village by his mother, and how his mother introduced him to marijuana at the age of 12.

{¶ 110} Montgomery stated he had been dropped off at his apartment the night of the killings after he finished selling crack for the evening. Initially when asked what he remembered about the night, he stated: "Just blacking out and, when I came to, everybody was dead." (Sept. 5, 2017 Tr. at 980.) He recalled, however, that in the apartment, while the children were asleep, he "started smoking marijuana[,] two blunts." Then, he stated he recalled being mad at Tia and remembered her arriving home, "[j]ust her getting in the door and me blacking out." (Sept. 5, 2017 Tr. at 982.); *see also* ("I just remember her getting in the door."). (Sept. 5, 2017 Tr. at 1041.) On cross-examination, he testified that when Tia entered the apartment, there "[w]asn't no argument." (Sept. 5, 2017 Tr. at 1043.) He repeated: "No argument." "Q. You just started stabbing her? A. I guess, yes," adding later

he did not recall. (Sept. 5, 2017 Tr. at 1043-44.) Montgomery also testified that Dr. Fradkin's note that he stated "[b]efore he killed Tia, he told her he had * * * anal sex with [X.X.]" related not to the night of the killings but to "the week prior." (Sept. 5, 2017 Tr. at 986.) Montgomery testified the voice on the 9-1-1 tape was that of Tia's daughter, Tahlia. He also stated he did not end that call.

{¶ 111} Montgomery stated that on emerging from what he said was the blackout, he took a shower to rid himself of the "blood on my hands and everywhere." (Sept. 5, 2017 Tr. at 988.) Then he took Tia's car to procure "more drugs" to numb himself because "I kn[e]w I had d[one] it." (Sept. 5, 2017 Tr. at 989.) Upon his return, he hid the car. He stated he remembers "trying to take my own life" just before the police came in. (Sept. 5, 2017 Tr. at 991.) He had blacked out in the past, he admitted, with C.D. and T.L., as well as with Tia. Although he knew he had hurt people during the blackouts before, he did not think he "was capable" of killing anyone during a blackout. (Sept. 5, 2017 Tr. at 994.)

{¶ 112} Montgomery asserted his trial attorneys never explained to him the ramifications of not pleading guilty, or going before a jury instead of a three-judge panel. He agreed he "trusted them" when he took their advice to waive the jury, but would not have gone to the three-judge panel had he understood the consequences then. (Sept. 5, 2017 Tr. at 1003-04.) He stated, too, that he was not seeking at the postconviction hearing to contest his guilt or to avoid responsibility. He asserted that in his pretrial interview with Dr. Fradkin, he was "open," felt comfortable, and told the doctor everything he needed to know. (Sept. 5, 2017 Tr. at 1034-35.)

### D. Trial Court's Postconviction Decision

{¶ 113} In a decision issued December 31, 2018, the trial court ruled Montgomery had received ineffective assistance of counsel during the mitigation phase and that he therefore is "entitled to a new mitigation/sentencing phase." (Postconviction Decision at 70.) The trial court rejected Montgomery's argument that he received ineffective assistance of counsel during the trial itself. The state has appealed and Montgomery has cross-appealed from those respective rulings.

{¶ 114} "As a threshold matter," the trial court noted Montgomery's "jury waiver and guilty plea were the subject of his direct appeal to the Supreme Court of Ohio," and that "the Ohio Supreme Court specifically held, after reviewing the colloquies surrounding Defendant's jury waiver and guilty plea, that the same were voluntary, knowing and

intelligent." (Postconviction Decision at 60.) Quoting from the Supreme Court, the trial court noted that Montgomery had "affirmed that his counsel had explained that by waiving a jury, he was electing not to have 12 people determine his guilt but was electing instead to have a panel of 3 judges decide his guilt and, if necessary, punishment." (Postconviction Decision at 60, quoting *Montgomery*, 2016-Ohio-5487, at ¶ 25.) Montgomery had "acknowledged that his attorneys had reviewed the written plea form with him before he signed it, had been 'diligent and effective' in representing him and in trying to act in his best interests, had informed him of his options, and had allowed him to make the decision as to whether to plead guilty or go to trial." (Postconviction Decision at 61, quoting *Montgomery*, 2016-Ohio-5487, at ¶ 39.)

{¶ 115} Then, in any event, and applying *Strickland v. Washington*, 466 U.S. 668 (1984), the trial court rejected Montgomery's postconviction claim that he received ineffective assistance of counsel during the trial phase when he accepted his counsel's recommendation to waive a jury trial and plead guilty. The trial court noted the ABA guidelines for death penalty representation are "merely guides and not determinative of the issues in this case," and found the strategic reasons given by Weisman "to follow a 'plead and panel' strategy," when taking into account "[t]he facts of this case," were not unreasonable. (Postconviction Decision at 62-63.) The trial court noted:

> The facts of this case are particularly gruesome. The evidence presented prior to the panel's acceptance of Defendant's guilty plea demonstrated that Defendant slit the throats of the victims with a knife, almost decapitating two-year-old Tyron. Hundreds of color photographs depicting the bloody crime scenes and victims were available to the State to present its case surrounding Defendant's guilt. In light of the same, it is not unreasonable for counsel to have advised a strategy whereby the prolonged presentation of such gruesome evidence would be avoided. It is also not unreasonable or outside the wide range of reasonable professional assistance to believe that experienced judges, who have presided over thousands of criminal cases over their respective careers, including other gruesome capital cases, would not be as swayed by such evidence as inexperienced jurors who may be much more easily guided by their emotions under the circumstances. Likewise, it is not unreasonable to believe that the judges would view a guilty plea as the Defendant taking responsibility and showing remorse, and that those factors would be considered and weighed against the death penalty in determining the appropriate sentence.

(Postconviction Decision at 63.)

{¶ 116} Moreover, the trial court found that even if that strategy was unreasonable, Montgomery's claim failed the prejudice prong of *Strickland* because "[g]iven the overwhelming evidence of his guilt," there was no probability that a plea of not guilty would have led to acquittal. (Postconviction Decision at 63-64.)

{¶ 117} The trial court did, however, agree with Montgomery on his claim asserting ineffective assistance of counsel during the sentencing phase. Recognizing that "the aggravating factors were extreme," the trial court focused on the mitigation side and particularly on the fact that no expert witnesses had been called to testify. (Postconviction Decision at 66.)

> While trial counsel had retained two knowledgeable and capable psychologists who could have provided the expert testimony to help the fact finders understand the relationships between [Montgomery's] untreated childhood traumas and his actions as an adult, trial counsel chose not to present that expert testimony to the three-judge-panel. Notably, when those experts testified during the postconviction evidentiary hearing, they explained the basis for their observations and opinions, and provided a much more detailed picture of the trauma throughout [Montgomery's] childhood and how that impacted his adult life.

(Postconviction Decision at 65.)

{¶ 118} "The lay witness testimony presented to the three-judge-panel established, for the most part, what happened to [Montgomery]," the trial court found. (Postconviction Decision at 67.) Although then equivocating somewhat that "there was no lay witness testimony to establish [Montgomery's] childhood sex abuse trauma,"[1] the decision concluded that "even if it were assumed that sufficient lay witness testimony was presented with respect to what happened to [Montgomery], there was no expert testimony—whether live or via video—to explain how what happ[en]ed to [Montgomery] as a child impacted him later in life." (Postconviction Decision at 67.)

---

[1] *Compare* June 6, 2012 Sentencing Opinion at 5 and fn. 6, detailing evidence of Montgomery having been raped at the age of 4.

{¶ 119}   The court found: "[T]he failure to present *any* such expert testimony in this case fell outside the wide range of reasonable professional assistance."   (Emphasis sic.) (Postconviction Decision at 67.)   The decision continued:

> The Court finds it was not reasonable, even when viewing the facts not with the benefit of hindsight but as of the time of counsel's conduct, to not present a single expert to testify about [Montgomery's] untreated childhood trauma–not only in terms of the sexual abuse but also the suffering and witnessing of physical abuse, the substance abuse, and the familial mental health problems–and explain how all of that impacted his brain development, his personal relationships and his adult life. Likewise, the Court finds it was not reasonable to further investigate into and provide a single expert witness to explain [Montgomery's] dissociation during a number of instances throughout his life, including possibly during the commission of the crimes.

(Postconviction Decision at 67-68.)

{¶ 120}   Having thus found ineffective assistance of counsel in the failure to call even one expert witness, the trial court then analyzed whether Montgomery had made a sufficient showing of prejudice.   The trial court determined it was "not convinced that the current mitigation presentation [from the postconviction hearing] would not have created a reasonable probability of a different outcome."   (Postconviction Decision at 69.)

{¶ 121}   After observing again that "[t]he murders involved in this case were heinous and the aggravating circumstances most definitely weighed in favor of the death penalty," the trial court then stated regarding the prejudice prong:

> However, since the expert testimonies of at the very least Stinson and Fradkin were not presented, and since those testimonies would have connected the dots and explained the significance and impact of the trauma throughout Defendant's life on his mental health and conduct–and would have done so in a qualified and professional manner, unlike that of any of the other witnesses who testified and unlike that of the judges on the panel–the undersigned [judge] cannot conclusively state that there is no reasonable probability that the panel would have reached a different conclusion had the experts testified during mitigation.

(Postconviction Decision at 69.)

{¶ 122}   The state has filed a timely notice of appeal and Montgomery has filed a cross-appeal.

## II. Assessment of the Assignments of Error

{¶ 123} The state presents the following five assignments of error:

[I.] THE TRIAL COURT ERRED IN FAILING TO PROVIDE FINDINGS OF FACT AND CONCLUSIONS OF LAW SPECIFICALLY RULING ON EACH POST-CONVICTION CLAIM.

[II.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FAILING TO SPECIFICALLY DENY CLAIM NO. 8.

[III.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION UNDER THE FIRST PRONG OF THE INEFFECTIVENESS STANDARD AS A REASONABLE COUNSEL COULD DECIDE NOT TO PRESENT EVIDENCE FROM AN EXPERT THAT WOULD INCLUDE SUBSTANTIAL NEGATIVES ABOUT DEFENDANT.

[IV.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION UNDER THE SECOND PRONG OF THE INEFFECTIVENESS STANDARD AS THE AGGRAVATING CIRCUMSTANCES WERE OVERWHELMING AND THE PROFFERED MITIGATION THEORIES CONTAIN DUBIOUS AND NOTABLE FLAWS.

[V.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION UNDER THE SECOND PRONG OF THE INEFFECTIVENESS STANDARD BY EMPLOYING THE WRONG STANDARD.

Montgomery's cross-assignments of error:

[I.] THE TRIAL COURT ERRED IN DENYING MONTGOMERY'S CLAIM THAT TRIAL COUNSEL WERE INEFFECTIVE DURING THE TRIAL PHASE OF HIS CAPITAL PROCEEDINGS (NINTH GROUND FOR RELIEF).

[II.] THE TRIAL COURT ERRED IN DENYING MONTGOMERY'S CLAIM THAT HIS RIGHTS TO DUE PROCESS AND EQUAL PROTECTION WERE VIOLATED BY HIS DISPROPORTIONATE SENTENCE (EIGHTH GROUND FOR RELIEF).

## III.  ANALYSIS OF THE ASSIGNMENTS OF ERROR

### A.  The State's First Assignment of Error

{¶ 124}  The state argues in its first assignment of error: "The trial court erred in failing to provide findings of fact and conclusions of law specifically ruling on each post-conviction claim."  (State's Appellate Brief at vi.)  The state argues the trial court failed to comply with R.C. 2953.21(H) by failing to rule individually on each of the 14 claims presented in Montgomery's petition.  The state describes the trial court's decision as imprecise and "vague," resulting in a decision so deficient that it lacks the status of a final appealable order.  (State's Appellate Brief at 3.)

{¶ 125}  The state correctly observes the trial court's decision "never itemized the 14 claims and did not * * * *specifically* rule on *each* claim," but such organizational precision— while may be desirable for clarity and in aid of review—is not necessarily required by the relevant portion of the governing statute so long as the grounds for the relief actually accorded are apparent along with the rationale for denying claims.  (Emphasis sic.)  (State's Appellate Brief at 5.)

{¶ 126}  R.C. 2953.21(H) recites: "If the petitioner has been sentenced to death, the findings of fact and conclusions of law [on a motion for postconviction relief] shall state specifically the reasons for the finding of grounds for granting the relief, with respect to each claim contained in the petition."  The Supreme Court has instructed that "[a] trial court need not discuss every issue raised by [defendant] or engage in an elaborate and lengthy discussion in its findings of fact and conclusions of law.  The findings need only be sufficiently comprehensive and pertinent to the issue to form a basis upon which the evidence supports the conclusion."  *State v. Calhoun*, 86 Ohio St.3d 279, 291-92 (1999), citing *State v. Clemmons*, 58 Ohio App.3d 45, 46 (2d Dist.1989).  Moreover, although "the trial court need not specifically designate parts of its decision as 'Findings of Fact' and 'Conclusions of Law,' the underlying rationale for the trial court's decision must be sufficiently clear to allow for meaningful appellate review."  *State v. Davis*, 10th Dist. No. 08AP-679, 2009-Ohio-1666, ¶ 10.

{¶ 127}  In this case, the first 56 pages or so of the trial court's 70-page decision set out the salient facts as the trial court saw them, and the last 10 pages or so ruled on the two overarching assertions of ineffective assistance of counsel that Montgomery raised: one group of claims concerning his guilty plea and the other concerning his mitigation hearing.

The trial court set forth its reasons for rejecting the former assertions and granting relief with regard to the latter.

{¶ 128}  As we have described, the trial court did make intelligible the basis for its ruling that Montgomery had been deprived of the effective assistance of counsel with regard to mitigation: counsels' performance was deficient because the lawyers should have adduced "the expert testimonies of at the very least Stinson and Fradkin," and the trial court found prejudice because it could not "conclusively state that there is no reasonable probability that the panel would have reached a different conclusion had the experts testified during mitigation."  (Postconviction Decision at 69.)  That recitation seems to us sufficiently detailed and clear "to allow for meaningful appellate review." *Davis* at ¶ 10. *See also State v. Yates*, 8th Dist. No. 91580, 2009-Ohio-609, ¶ 17 (a trial court's decision that "merged its discussion" of two "interrelated * * * claims of ineffective assistance of counsel" both "fully addressed those claims and plainly satisfied the requirements" of the postconviction statute).

{¶ 129} The trial court did not explicitly address Montgomery's claim of disproportionate sentencing but, as explained below, that claim was subject to res judicata and we find no error under R.C. 2953.21(H) for what both parties agree was its denial; we need not send the case back to the trial court for resolution of this issue.  In all other respects, while a more structured organizational approach to the trial court's decision probably would have been preferable to the form of the trial court's analysis, the trial court's decision is "sufficiently comprehensive and pertinent" to the claims raised by Montgomery's petition for our review. *Calhoun* at 291.

{¶ 130}  Montgomery argues the trial court's decision is "comprehensive, detailed, and pertinent to the issues presented," and submits that it enables us " 'to properly determine appeals.' "  (Citation omitted.)  (Montgomery's Cross-Appellate Response Brief at 25-26.)  We agree the trial court's decision resolved the claims before it, and that the trial court did not err in failing to provide findings of fact and conclusions of law as claimed by the state.

{¶ 131}  Accordingly, we  overrule the state's first assignment of error.

**B.  The State and Montgomery's Second Assignments of Error**

{¶ 132}  We consider the parties' second assignments of error together as they both concern the trial court's handling of Montgomery's claim of disproportionate sentencing.

The state argues in its second assignment of error the trial court erred and abused its discretion in failing to specifically deny the eighth claim for relief. Montgomery argues in his second assignment of error that the trial court erred in denying his claim that his rights to due process and equal protection were violated by his disproportionate sentence.

{¶ 133} The parties agree the trial court effectively denied Montgomery's eighth claim for relief by failing to address it in its decision.

{¶ 134} The claim, which asserted the death sentence violated Montgomery's due process and equal protection rights because it was disproportionate to sentences received by similarly situated capital defendants in Franklin County is without merit for several reasons.

{¶ 135} First, Montgomery's argument that his due process rights were violated by the imposition of a disproportionate death sentence is barred by res judicata. "Under the doctrine of *res judicata*, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment." *State v. Szefcyk*, 77 Ohio St.3d 93 (1996), syllabus. Any constitutional argument concerning disproportionality in sentencing was required to have been raised in Montgomery's direct appeal.

{¶ 136} Second, we note, and discuss further below, the Supreme Court did conduct a proportionality review of Montgomery's sentence during his direct appeal. *Montgomery*, 2016-Ohio-5487, ¶ 189-91; R.C. 2929.05(A) ("In determining whether the sentence of death is appropriate, * * * the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases.").

{¶ 137} Montgomery argues his sentence was disproportionate to sentences imposed upon "similarly situated capital defendants in Franklin County, Ohio." Montgomery provides no explanation for why this argument could not have been raised during his direct appeal, as the data concerning capital defendants in Franklin County was a matter of public record at that time. *See State v. Short*, 2d Dist. No. 27399, 2018-Ohio-2429, ¶ 111 (holding that petitioner's postconviction claim of a disproportionate death sentence compared with a life sentence imposed on a defendant in the same county was

"barred by the doctrine of res judicata" because the "case was available for review" by the time the Supreme Court conducted the proportionality analysis during the direct appeal).

{¶ 138} The Supreme Court held in Montgomery's direct appeal that "the death penalty is appropriate and proportionate for both children's murders when compared to death sentences approved in similar cases." *Montgomery*, 2016-Ohio-5487, at ¶ 189. The Supreme Court observed that it has "upheld death sentences for other child murders under R.C. 2929.04(A)(9) many times." (Citations omitted.) *Id.* at ¶ 190. "Moreover," continued the court, "we have previously upheld the imposition of death where the defendant was convicted of both the course-of-conduct specification under R.C. 2929.04(A)(5) and the escaping-detection specification under R.C. 2929.04(A)(3)." (Citations omitted.) *11/09/2016 Case Announcements*, 2016-Ohio-7677 (modifying ¶ 191 of *Montgomery*, 2016-Ohio-5487). So Montgomery's point of contention here is not so much with the trial court as with the Supreme Court. Indeed, he specifically takes issue with the holding in *State v. Steffen*, 31 Ohio St.3d 111 (1987), paragraph one of the syllabus that "[t]he proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." (*See* Montgomery's Cross-Appellate Brief at 19 (deeming *Steffen* unfair and irrational).) As an intermediate court, we are bound by the rulings of our Supreme Court.

{¶ 139} Finally, we note the state is not positioned to claim error arising from the trial court's failure to address Montgomery's proportionality claim, as the state suffers no prejudice on appeal by what all agree is the claim's effective denial.

{¶ 140} Accordingly, we overrule the second assignments of error in the state's appeal and in Montgomery's cross-appeal.

### C. The State's Third Assignment of Error

{¶ 141} In its third assignment of error, the state argues the trial court erred and abused its discretion under the first prong of the ineffectiveness standard as reasonable counsel could decide not to present evidence from an expert that would include substantial negatives about the defendant. Citing the "immense negatives" that the defense's current preferred mitigation presentation would unavoidably present, the state argues that "[t]he mere existence of a 'mitigating' spin on defendant's history of murderous and violent behavior does not demonstrate that all reasonable counsel would have decided to pursue a

wide-ranging presentation including a litany of counterproductive evidence, including years of domestic violence."  (State's Cross-Appellee Brief at 14.)

{¶ 142}  When considering a claim of ineffective assistance of counsel, a trial court must apply the framework outlined in *Strickland. Strickland* requires satisfying a two-prong test: "*Strickland* requires that the defendant show, first, that his counsel's performance was deficient and, second, that his counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.  * * *  In order to show deficient performance, defendant must prove that his counsel's performance fell below an objective level of reasonable representation.  To show prejudice, defendant must show a reasonable probability that, but for his counsel's errors, the result of the proceeding would have been different."  *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 133, citing *Strickland*. In reviewing a trial court's ruling regarding ineffective assistance of counsel during mitigation, an appellate court must accord deference to the trial court as follows: "[A] trial court's decision granting or denying a postconviction petition filed pursuant to R.C. 2953.21 should be upheld absent an abuse of discretion; a reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence."  *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 58.

{¶ 143}  Here, we find competent and credible evidence to support the trial court's conclusion that the defense's "failure to present *any* such expert testimony" to explain how untreated trauma experienced by Montgomery as a child impacted him later in life fell outside the wide range of reasonable professional assistance. (Emphasis sic.) (Postconviction Decision at 67.)  Therefore, as we discuss in more detail below, the trial court did not abuse its discretion in concluding the first prong of *Strickland*—that trial counsel was deficient in performance regarding mitigation—had been met.

{¶ 144}  The state argues the defense's determination to not present experts as witnesses was a strategic or tactical decision.  Generally, "[s]trategic and tactical decisions of trial counsel cannot form the basis of a claim of ineffective assistance of counsel."  *State v. Thompson*, 10th Dist. No. 18AP-211, 2019-Ohio-2525, ¶ 21, citing *State v. Glenn-Coulverson*, 10th Dist. No. 16AP-265, 2017-Ohio-2671, ¶ 56, citing *Columbus v. Oppong*, 10th Dist. No. 15AP-1059, 2016-Ohio-5590.  Furthermore, in *State v. Turner*, 10th Dist. No. 04AP-1143, 2006-Ohio-761, ¶ 28, we stated "[b]ecause appellant's trial counsel

presented a meaningful concept of mitigation at trial, counsel was not ineffective simply because another possible theory of mitigation existed."

{¶ 145} However, the Supreme Court has said in a capital case, "[a]n attorney's failure to reasonably investigate the defendant's background and present mitigating evidence to the jury at sentencing can constitute ineffective assistance of counsel." *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, ¶ 219, citing *Wiggins* at 521-22. " 'Defense counsel has a duty to investigate the circumstances of his client's case and explore all matters relevant to the merits of the case and the penalty, including the defendant's background, education, employment record, mental and emotional stability, and family relationships.' " *Id.*, quoting *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir.2011).

{¶ 146} In evaluating the first prong of the ineffectiveness standard, the trial court observed the three theories and/or evidence Montgomery alleged should have been presented in mitigation:

> 1.) the untreated PTSD and dissociation flowing from [Montgomery] having been sexually assaulted as a young child; 2.) [Montgomery's] dysfunctional family history, consisting of alcohol and substance abuse (including while [Montgomery] was in utero, which affected his development), inadequate parenting, physical abuse, witnessing domestic violence at home, abandonment and mental health problems; and 3.) mitigating factors from [ Montgomery's] adult life, including his relationships with his children, stable employment history, and adjustment to prison life.

(Postconviction Decision at 64.)

{¶ 147} The trial court also observed "trial counsel had retained two knowledgeable and capable psychologists who could have provided the expert testimony to help the fact finders understand the relationships between [Montgomery's] untreated childhood traumas and his actions as an adult, [yet,] trial counsel chose not to present that expert testimony to the three-judge-panel." (Postconviction Decision at 65.) The trial court further noted that where the experts testified at the postconviction hearing, they "provided a much more detailed picture of the trauma throughout [Montgomery's] childhood and how that impacted his adult life." (Postconviction Decision at 65.)

{¶ 148} The court answered in the affirmative the question of "whether in light of the facts of this particular case and when those facts are viewed as of the time of counsel's conduct, it was unreasonable or outside the wide range of reasonable professional

assistance for counsel to not adequately investigate all of the mitigation evidence available at the time, and not present a single expert witness who could connect the dots between the untreated trauma that [Montgomery] suffered throughout his childhood and how that impacted his adult life."  (Postconviction Decision at 66.)

{¶ 149}   In its analysis, the trial court focused on trial counsel's reliance on the three-judge panel's experience of having considered such cases.  The court found:

> At the end of the day, while the judges on the panel have listened to countless experts testify over the years about various mental health issues and traumatic events, none of them had the specialized knowledge or education to professionally assess the untreated trauma in Defendant's childhood and how that impacted him later in life. Nor did they have the in-depth knowledge and insight related to the state of the juvenile justice system while  [Montgomery] was institutionalized during his youth.
>
> The lay witness testimony presented to the three-judge-panel established, for the most part, what happened to Defendant. The Court notes, however, that other than references to Defendant having been sexually assault[ed] as a child, which references were made during opening statements and closing arguments, there was no lay witness testimony to establish Defendant's childhood sex abuse trauma. However, even if it were assumed that sufficient lay witness testimony was presented with respect to what happened to Defendant, there was not expert testimony – whether live or via video – to explain how what happened to Defendant as a child impacted him later in life.
>
> The Court finds the failure to present *any* such expert testimony in this case fell outside the wide range of reasonable professional assistance. While Stinson's report was included in the binders constituting Joint Exhibits 1 and 2, as Stinson himself noted during the post-conviction evidentiary hearing, live testimony provides richness of detail not found in a report. The Court agrees with Stinson's characterization that a written report is more of an outline, while the testimony really showcases the expertise of the psychologist, the research and literature that applies in the case, and provides a much fuller and better view of the situation than if a report is simply submitted along with the evidence. The Court finds it was not reasonable, even when viewing the facts not with the benefit of hindsight but as of the time of counsel's conduct, to not present a single expert to testify about [Montgomery's] untreated childhood trauma - not only in terms of the sexual abuse but

> also the suffering and witnessing of physical abuse, the substance abuse, and the familial mental health problems – and explain how all of that impacted his brain development, his personal relationships and his adult life. Likewise, the Court finds it was not reasonable to further investigate into and provide a single expert witness to explain [Montgomery's] dissociation during a number of instances throughout his life, including possibly during the commission of the crimes.

(Emphasis sic.) (Postconviction Decision at 66-68.)

{¶ 150} The trial court's analysis and conclusion is supported by competent and credible evidence. In particular, trial counsel Weisman's own testimony:

> Q: As you sit here today and think back on your representation of Mr. Montgomery, do you believe there are things that you should have done differently given the standards that were applicable to you during that time?
>
> * * *
>
> A. We should have done things differently.
>
> Q. What should you have done differently?
>
> A. * * * I should have offered Dr. Stinson's testimony. Leaving that out and expecting the Court, because they are more educated than the jurors that appear in front [of] them, to recognize there were some issues was a bad decision by me, a terrible decision by me.

(Aug. 21, 2017 Tr. Vol. I at 116-17.)

{¶ 151} Weisman testified to this fully aware of the immense "negatives" the presentation of such expert testimony could have revealed.

{¶ 152} The trial court's analysis and conclusion is also supported by the testimony of Dorian Hall. As the mitigation supervisor at OPD, Hall had personal or supervisory experience of having investigated over 247 capital cases. She also was the supervisor to Heiby, the mitigation investigator on this case. Hall testified generally about the process of preparing mitigation and the significance of negative information about a client:

> Q: So sometimes even the negative information, prior bad acts or things that at first glance seem bad for the client, those can actually be helpful because they're helping to explain the situation.

A: Correct. And those are information the psychologist and the experts may pick up on that help support their diagnosis or their assessment of the individual as well.

(Aug. 21, 2017 Tr. Vol. I at 211.) Hall also testified specifically about mitigation for Montgomery:

Q: And so those themes that I just asked you about, the substance abuse, dissociation, and Post-Traumatic Stress Disorder, are those themes that necessitate an expert testimony to fully explain the impact of those things on Mr. Montgomery?

A. Yes.

* * *

Q. Did the way the evidence was presented at Mr. Montgomery's mitigation hearing present an accurate multi-dimensional picture of his life?

A. No. There weren't the details and the information, and there were a lot of themes that weren't fully developed, and nor were there experts that could explain the impact of those events and explain who Mr. Montgomery was.

(Aug. 21, 2017 Tr. Vol. I at 235-36.) Hall testified to this after having reviewed the affidavits of Drs. Stinson, Fradkin, and Reardon.

{¶ 153} Finally, we note the testimony of criminal defense attorney Malarcik who, as noted above, is certified by the Supreme Court for capital case representation, has developed and taught many courses and seminars on capital defense skills, and has represented seven defendants charged with aggravated murder and death penalty specifications. Regarding trial counsels' mitigation presentation, Malarcik testified on direct:

Q. After the consideration of the materials that you reviewed specifically for this case, do you have an opinion about whether Mr. Montgomery's trial counsel[s'] representation was reasonable under the prevailing professional norms expected of a trial counsel in a capital case that prevailed in 2011 and '12?

A. I do.

Q. What is that opinion?

> A. I believe that the representation he received fell well below the professional norms expected of counsel in capital cases.

(Aug. 25, 2017 Tr. Vol. IV at 761.)

{¶ 154} Malarcik referred to a 2017[2] United States Supreme Court habeas case, *McWilliams v. Dunn*, 137 S.Ct. 1790 (2017),[3] and testified about the role of an expert in mitigation:

> Q. [W]hat is instructive in the Dunn case is the Supreme Court went to great lengths to talk about how important the role of an expert witness is in investigating, preparing, and presenting effective mitigation. The Supreme Court talked about what an expert's role is in mitigation.
>
> And their role is to take all these reports and to take all this data and to sit down with trial counsel and translate that data into some kind [of] effective legal strategy to help defense counsel to prepare a  - - and present arguments that form the theme and theory of your mitigation. The expert witness can help the defense attorneys prepare for Direct and Cross-Examination consistent with these themes of mitigation *and ultimately to testify at trial to provide the nexus between what the lay witnesses are telling the Judge or the jury your client has experienced and how this affects adult behavior and ultimately the nexus between the aggravating circumstances that make your client eligible for the death penalty*.

(Emphasis added.) (Aug. 25, 2017 Tr. Vol. IV at 774-75.) Malarcik continued:

---

[2] Malarcik noted that *Dunn* addressed whether trial counsel's conduct, that occurred before 2011 and 2012, violated clearly established Federal law which was in effect before 2011 and 2012.

[3] In *Dunn*, the United States Supreme Court reiterated that a capital defendant "must receive the assistance of a mental health expert who is sufficiently available to the defense and independent from the prosecution to effectively 'assist in evaluation, preparation, and presentation of the defense.' " *Dunn* at 1799, quoting *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). *Dunn* restated the United States Supreme Court's holding in *Ake* in explaining that the state is required to provide the defense with access to "a mental health expert who is sufficiently available to the defense and independent from the prosecution to effectively [conduct an appropriate [1] examination and] 'assist in [2] evaluation, [3] preparation, and [4] presentation of the defense.' " *Dunn* at 1800, quoting *Ake* at 83. In *Dunn*, the United States Supreme Court concluded: "We are willing to assume that Alabama met the *examination* portion of this requirement by providing for Dr. Goff's examination of [defendant] McWilliams. * * * But what about the other three parts? Neither Dr. Goff nor any other expert helped the defense evaluate Goff's report or McWilliams' extensive medical records and translate these data into a legal strategy. Neither Dr. Goff nor any other expert helped the defense prepare and present arguments that might, for example, have explained that McWilliams' purported malingering was not necessarily inconsistent with mental illness (as an expert later testified in postconviction proceedings * * *). Neither Dr. Goff nor any other expert helped the defense prepare direct or cross-examination of any witnesses, or testified at the judicial sentencing hearing himself." (Emphasis sic.) *Id.* at 1800-01.

Q. From your review of the materials in this case, did you find that there was significant mitigating evidence that trial counsel could have and should have presented but did not?

* * *

A. Yes. First and foremost, I believe that there were key expert witnesses that could have and should have been presented as compelling mitigation in Mr. Montgomery's case. Dr. Reardon, Dr. Fradkin, and Dr. Stinson should have been involved early and often and could have and should have done the things that the McWilliams case, the Dunn case talked about * * *.

* * *

You want to use these witnesses, expert witnesses, to tie it all together and to explain to the trier of fact how all these events that occurred in your client's life affect his or her adult choices and adult behavior and create a nexus between all these events that have occurred and what these records demonstrate and the activity that your client committed on the day that these individuals were killed.

That should have been done here. It's available. It's compelling. And it wasn't done.

(Aug. 25, 2017 Tr. Vol. IV at 810-12.) Concluding his testimony on direct examination, Malarcik opined:

Q. Okay. Based on the materials you reviewed along with your education, training, and experience as a capital defender and one who teaches capital defense litigation, was there evidence to present a compelling mitigation story in this case?

A. Yes.

Q. Based on your -- on the materials that you reviewed, did the evidence of a compelling mitigation story exist at the time of trial in 2011 and '12?

A. Yes.

Q. Had trial counsel followed the professional norms that you have testified to here today, would trial counsel have discovered the evidence of a compelling mitigation story that you've described in your testimony?

A. Yes.

Q. In your professional opinion, based on the materials you reviewed and based on your education, training and experience, did trial counsels' performance in Mr. Montgomery's case meet the professional norms expected of a capital defense attorney?

A. It did not.

Q. And, as we've already talked about, this trial took place in 2011, 2012.

A. Right.

Q. Does that fact change your answer?

A. No.

(Aug. 25, 2017 Tr. Vol. IV at 815-16.)

{¶ 155} On cross-examination, the state questioned Malarcik generally about the downside of presenting the defense suggested by Montgomery and specifically about the downside of presenting the testimonies of Drs. Stinson and Fradkin and possibly opening the door to negative evidence including evidence of domestic violence reported by Montgomery's former partners, T.L. and C.D.:

[Prosecuting Attorney] Q. Don't you think there are downsides to putting in all of these records, all of these witness summaries into the case in front of any fact-finder?

A. I think whatever potential downsides were there were outweighed by the benefit of explaining how Caron Montgomery arrived at November 25, 2010. Sure, there's some risk and there's some downside there, but that's not the end of the analysis, obviously.

* * *

Q. And that summary [by Heiby of domestic abuse and Montgomery brandishing a gun, threatening to kill T.L. and her kids] was given to Dr. Stinson as part of his review, and so, if you put on Dr. Stinson, you're going to have to produce that summary, don't you think?

* * *

A. I'm sorry. What I was going to say is, again, the way to deal with this is through an aggressive pretrial practice, a motion in limine, and you bring this to the attention of the Judge. Look, Judge, what opens the door? Let's get some parameters here. And you lay it all out. And then you get an informed decision from the Court. And it's in limine, obviously, but that then allows you to make intelligent, informed decisions about how do we keep the door closed and do we want to put this witness on or not. And I think with a lot of effort, a skilled advocate could navigate that difficult tightrope. It's done in capital cases all the time.

And what happened in here is the complete opposite. There was no motion in limine trying to keep out a non-aggravating factor. I think there's grounds that you could have argued that. And the opposite happened. They opened the door to all of this bad evidence coming in.

* * *

Q. Wouldn't that just be a brutal blow to the defense to put that [the summary of daily domestic abuse of C.D.] on in your mitigation case?

A. Standing alone, yes, but that's not the only decision.

When properly developed and when you follow *McWilliams versus Dunn* and you bring the expert in and say, what does this mean, and you develop a theme and a theory and you talk about disassociation [sic] and it ties into the facts of the aggravating circumstances, that's how you develop and potentially present key mitigation. That wasn't done.

Q. Would you agree it's a downside to the put-in-all-the-records-and-experts strategy?

A. Standing alone, I would never do it, never.

Q. Never do what?

A. Put all that into the record by itself without motions in limine, without attempting to mitigate, without the existence of an expert to explain how this happened. That's ineffective.

Q. Right. And that's - - under the current approach that the defense is touting and you're espousing, all of that would have come in, right - -

A. But not alone.

Q. - - because all the records were used by the experts.

A. Yeah. My point is it comes in but not by itself. It comes in as part of your mitigation theme and part of an overall education of the trier of fact with these expert witnesses.

Q. I understand that it would come in with an explanation - -

A. Right.

Q. - - and in a context. I agree with that. And that's what you're contending. But it's still a downside, isn't it?

A. Yes.

Q. Is it a minor downside or a major downside - -

A. Well, it depends on what your experts can say to put it into context. That's how you mitigate it. That's really the definition of mitigation is taking something that is a problem and attempting to lessen the moral culpability of those acts. And I think that can and that has been done here. So is it a downside? Yes. But, in the overall presentation of mitigation, would I have included that? Yes.

* * *

Q. [I]sn't it reasonable that counsel would not want Dr. Fradkin's report in front of the three-judge panel and in front of the prosecution?

A. No, because, again, there's more to what Dr. Fradkin is saying, and his report is viewed in the overall context of where we are today with Dr. Stinson and with Dr. Reardon. And I think those are - - those all help explain and mitigate this abhorrent conduct that you're talking about.

(Aug. 25, 2017 Tr. Vol. IV at 906-23.)

{¶ 156} On redirect, Montgomery's counsel asked Malarcik about a passage from the direct appeal, *Montgomery*, 2016-Ohio-5487:[4]

> Q. Counsel asked you about a passage from the Ohio Supreme Court - - I assume it was the direct appeal decision in this case - - talking about trial counsel's sound deliberation and judgment. Do you recall that passage?
>
> A. I do.
>
> Q. When you hear the phrase "sound deliberation and judgment" in the context of trial counsels' performance for professional norms, what does that imply to you?
>
> A. That implies to me that those professional norms were met or exceeded.
>
> Q. And in the context of this particular case - -
>
> A. That did not happen.
>
> Q. Thank you.
>
> But, in addition to that, in the context of this particular case, the trial direct appeal record did not include any of the evidence that has been presented at this hearing. Is that right?
>
> A. Correct.

(Emphasis added.) (Aug. 25, 2017 Tr. Vol. IV at 931.)

{¶ 157} Malarcik's testimony, summarized above, reveals that he carefully considered the substantial negatives highlighted by the state of presenting the expert

---

[4] We perceive that Montgomery's counsel is referring to the Supreme Court's recitation of the *Strickland* standard that "[a] defendant alleging ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of *reasonable professional judgment*." (Emphasis added.) *Montgomery*, 2016-Ohio-5487, at ¶ 86. We perceive that counsel and Malarcik are referring to the Supreme Court's analysis of Montgomery's ineffective assistance claim, in the direct appeal, for failure to present expert testimony during mitigation. In particular, the Supreme Court's observation that its analysis was based on a silent record. The Supreme Court stated "[a] trial attorney's decision 'to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel.' " *Id.* at ¶ 120, quoting *State v. Keith*, 79 Ohio St.3d 514, 536 (1997). "We will not ' "infer a defense failure to investigate from a *silent* record." ' " (Emphasis added.) *Id.*, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 65, quoting *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶ 244; *see also State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, ¶ 288 (defense counsel's decision not to present testimony of retained experts in mitigation was reasonable trial strategy because "[*n*]*othing in the record* shows that this decision was the result of an inadequate investigation"). (Emphasis added.) *Montgomery*, 2016-Ohio-5487, at ¶ 120

testimonies of Drs. Stinson and Fradkin. Notwithstanding, Malarcik opined Montgomery's trial counsel was ineffective in failing to present the expert testimonies as mitigation.

{¶ 158} Taking all this into consideration, in particular the testimony of Weisman, Hall, and Malarcik, we find the trial court's conclusion that Montgomery's trial counsel was deficient with regard to mitigation was supported by competent and credible evidence and, therefore, was not an abuse of discretion.

{¶ 159} Accordingly, we overrule the state's third assignment of error.

### D. The State's Fourth and Fifth Assignments of Error

{¶ 160} The state's fourth and fifth assignments of error challenge the trial court's ruling under the second *Strickland* prong. In the fifth assignment of error, the state asserts the trial court erred by applying the wrong standard in analyzing the second prong. In the fourth assignment of error, the state asserts the trial court abused its discretion in its ultimate determination under the second prong. We examine the fifth assignment of error first.

{¶ 161} A defendant must satisfy both prongs of *Strickland* to demonstrate ineffective assistance of counsel; a failure to make one showing or another defeats the claim. *See also State v. Bradley*, 42 Ohio St.3d 136, 143 (1989). As noted above, having found trial/defense counsel to be deficient with its presentation of mitigation, regarding the second prong of *Strickland*, the trial court found: "since the expert testimonies of at the very least Stinson and Fradkin were not presented [the court] cannot conclusively state that there is no reasonable probability that the panel would have reached a different conclusion had the experts testified during mitigation." The trial court also stated: "[i]n the case at bar, given the totality of the evidence presented and arguments raised with respect to the failure to adequately investigate the mitigation evidence available at the time, and the failure to use expert witnesses to support the mitigation themes, the Court is not convinced that the current mitigation presentation would not have created a reasonable probability of a different outcome." (Postconviction Decision at 69.)

{¶ 162} "On the issue of counsel's ineffectiveness, the petitioner has the burden of proof." *Gondor* at ¶ 62. "In order to show deficient performance, defendant must prove that his counsel's performance fell below an objective level of reasonable representation. To show prejudice, defendant must show a reasonable probability that, but for his counsel's errors, the result of the proceeding would have been different." *Jackson* at ¶ 133, citing

*Strickland* and *Bradley*; *see also State v. Pagan*, 10th Dist. No. 19AP-216, 2019-Ohio-4954, ¶ 18 (the accused must make both showings). Thus, "the petitioner must submit sufficient operative facts or evidentiary documents that demonstrate that the petitioner was prejudiced by the ineffective assistance." *Gondor* at ¶ 62.

{¶ 163} The state argues the burden of proving ineffectiveness is on the defendant, and that the trial judge confusingly flipped the burden of proof. Further, the state argues it was not the state's burden to conclusively or convincingly negate such probability.

{¶ 164} Notwithstanding the trial court's use of double negatives, and the terms "convinced" and "conclusively," we find the trial court did cite to and apply the correct standard. First, the court quoted R.C. 2953.21(A)(1)(a) which states that "[a]ny person who has * * * been convicted of a criminal offense and sentenced to death and who claims that there was a denial or infringement of the person's rights under [the Ohio Constitution or the Constitution of the United States] *that creates a reasonable probability of an altered verdict* * * * may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief." (Emphasis added.)

{¶ 165} Second, the court quoted *Strickland* regarding the second prong. The court quoted *Strickland*'s direction that: " '*Second, the defendant must show that the deficient performance prejudiced the defense*. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " (Emphasis sic.) (Postconviction Decision at 57 quoting *Strickland* at 687.) The court also quoted *Strickland*'s direction that to satisfy the second prong, the defendant " 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (Postconviction Decision at 58, quoting *Strickland* at 694.) The court then quoted *Strickland* stating:

> The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. * * * When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer - - including an appellate court, to the extent it independently reweights the evidence - - would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

(Postconviction Decision at 59, quoting *Strickland* at 695.)

{¶ 166}   Finally, before concluding that Montgomery received ineffective assistance of counsel, the trial court summarized the task before it:

> However, the task in front of the Court at this time is not to re-sentence Defendant. Rather, the Court is to determine whether defense counsel's failure to offer any expert testimony with respect to Defendant's childhood trauma and how that trauma affected his adult life, including factors such as those included in his ACES score, constituted ineffective assistance of counsel such that Defendant should be allowed to have another sentencing hearing. In other words, the question before the Court is, first, whether in light of the facts of this particular case and when those facts are viewed as of the time of counsel's conduct, it was unreasonable or outside the wide range of reasonable professional assistance for counsel to not adequately investigate all of the mitigation evidence available at the time, and not present a single expert witness who could connect the dots between the untreated trauma that Defendant suffered throughout his childhood and how that impacted his adult life. *Second, the Court must answer whether there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.* The Court answers both of those questions in the affirmative.

(Emphasis added.) (Postconviction Decision at 66.)

{¶ 167}   Thus, the trial court did not apply the wrong standard or flip the burden in analyzing the second prong of the *Strickland* test.  Therefore, the trial court did not err in this regard.

{¶ 168}   Accordingly, we overrule the state's fifth assignment of error.

{¶ 169}   In the fourth assignment of error, the state argues the trial court erred and abused its discretion in determining that the second prong of the *Strickland* test had been met because the aggravating circumstances were overwhelming and the proffered mitigation theories contain dubious and notable flaws.

{¶ 170}  Regarding the state's argument that the proffered mitigation theories contain dubious and notable flaws, we refer to the testimonies of Weisman, Hall, and Malarcik referenced above.  Based on their testimonies, we reject the state's argument that the proffered mitigation theories contained dubious and notable flaws.

{¶ 171} Regarding the state's argument that the aggravating circumstances were overwhelming, we note that in conducting its analysis, the trial court acknowledged the same. The court observed that the aggravating factors were extreme and that "[t]he purpose to kill, evident in the execution-style slitting of the throats of the victims, including the children, is an extreme aggravating factor. Likewise, the ages of the children, two and ten for Tyron and [Tahlia], respectively, weighed heavily in favor of the death penalty during the original mitigation presentation and still weigh heavily in favor of the death penalty at this time." (Postconviction Decision at 66.) The court also stated that in determining the second prong has been met, it was not "in any way minimizing the effect of the serious aggravating circumstances that were presented including the victim-under-13 aggravator, since Tahlia was ten and Tyron was two, and the intent to kill aggravator, given that [Montgomery] slit the throats of these two young, innocent children (Tyron's all the way down to the trachea and esophagus), and that [Montgomery] had to overcome Tahlia's resistance in light of her defensive wounds. The murders involved in this case were heinous and the aggravating circumstances most definitely weighed in favor of the death penalty." (Postconviction Decision at 69.)

{¶ 172} However, the court observed that resentencing Montgomery was not the task before it; rather, the question before the court was to "answer whether there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." (Postconviction Decision at 66.) The court answered that question in the affirmative. The court further noted:

> [S]ince the expert testimonies of at the very least Stinson and Fradkin were not presented, and since those testimonies would have connected the dots and explained the significance and impact of the trauma throughout Defendant's life on his mental health and conduct - and would have done so in a qualified and professional manner, unlike that of any of the other witnesses who testified and unlike that of the judges on the panel - the undersigned cannot conclusively state that there is no reasonable probability that the panel would have reached a different conclusion had the experts testified during mitigation.

(Postconviction Decision at 69.)

{¶ 173} The trial court was fully aware of the overwhelming nature of the aggravating circumstances and expressly acknowledged the same during its analysis of the

second prong.  Furthermore, the trial court judge who determined the second prong of *Strickland* was met was also the presiding judge of the original panel. Taking all this into consideration, we cannot find that the trial court abused its discretion in determining the second prong of *Strickland* had been met.

{¶ 174}  Accordingly, we overrule the fourth assignment of error.

### E.  Montgomery's First Assignment of Error

{¶ 175}  We turn last to Montgomery's first assignment of error in his cross-appeal, which contends: "The trial court erred in denying Montgomery's claim that trial counsel were ineffective during the trial phase of his capital proceedings (Ninth Ground for Relief)." (Merit Brief of Cross-Appellant at 7.)  Under this assignment, Montgomery contends his trial counsel were ineffective "regarding the decision to waive his right to a jury trial, and to plead guilty to all charges without any concessions from the State."  (Merit Brief of Cross-Appellant at 7.)

{¶ 176}  In denying this claim, the trial court quoted extensively from the Supreme Court's decision on Montgomery's direct appeal discussing his acknowledgements at the time of the plea that he understood the significance of the jury waiver and that counsel had carefully reviewed the plea with him.  We note that in that direct appeal and on the record as it stood then, the Supreme Court rejected arguments relating to the validity of the jury waiver and the guilty plea, and specifically rejected the assertion that "defense counsel were ineffective for advising him to plead guilty to the indictment without securing an agreement from the state not to pursue the death penalty."  *Montgomery,* 2016-Ohio-5487, at ¶ 96. The court noted that advice to "pleading guilty to capital charges without a guaranteed life sentence is not per se ineffective assistance."  *Id.* at ¶ 100, citing *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, ¶ 82, 85. The Supreme Court also observed that Montgomery's "defense counsel could have 'reasonably believed that a guilty plea could minimize the effect of gruesome facts and a brutal murder, especially before a three-judge panel,' " and that pleading guilty demonstrated an acceptance of responsibility as a mitigating factor.  *Id.* at ¶ 101, citing *Ketterer* at ¶ 86; *see also id.* at ¶ 102 (further observing that defense counsel had "engaged in significant adversarial testing of the state's case" while also mounting a mitigation case, and that remorse and a plea of guilty count toward mitigation).

{¶ 177}  Nonetheless, the trial court did not rest its decision here on grounds of res judicata but, instead, concluded that in light of the "particularly gruesome" facts of the case,

it was not unreasonable for defense counsel to have sought to hold the introduction of bloody crime scene evidence to a minimum (through plea) and (through the panel election) to have preferred judges experienced in evaluating gory presentations over "jurors who may be much more easily guided by their emotions under the circumstances." (Postconviction Decision at 63.)  Moreover, the court emphasized that it was not unreasonable for defense counsel to hope that the panel would find mitigation in "the Defendant taking responsibility and showing remorse." (Postconviction Decision at 63.)  The trial court thus concluded that "trial counsel[s'] decision to advise their client to follow a 'plead and panel' strategy is not unreasonable and is not indicative of ineffective assistance of counsel." (Postconviction Decision at 63.)  And the trial court found additionally and in any event that "[g]iven the overwhelming evidence of his guilt," Montgomery did not satisfy the prejudice prong of *Strickland* with regard to the plea and trial proceedings.  (Postconviction Decision at 63.)

{¶ 178}  This part of the trial court's decision was reasoned and assessed relevant factors. And evidence from the postconviction hearing supports the trial court's conclusions as to defense counsels' thinking.  The defense had engaged in "[n]onstop" efforts at plea negotiations. (Aug. 21, 2017 Tr. Vol. I at 68 (Weisman testimony).)  And the plea and panel recommendation was calculated by the defense team with much "nervousness" and full knowledge of potential "negatives"; "[i]t was not a decision made quickly or lightly." (Aug. 21, 2017 Tr. Vol. I at 79.)  Montgomery's lead trial counsel indeed believed that the three-judge panel would be more amenable to using "acceptance of responsibility as a mitigation tool" than would a jury. (Aug. 21, 2017 Tr. Vol. I at 154.)  He "thought that [at least two of the three Judges] would be responsive to the guilty plea and some of the other things that we were going to be able to offer." (Aug. 21, 2017 Tr. Vol. I at 75-76.)  He also believed that judges would be less swayed by the "gruesomeness" of the state's evidence based on their years of courtroom experience, and that it would be better to have a "shortened proceeding" before a panel. (Aug. 21, 2017 Tr. Vol. I at 154, 157.)  Further, although Montgomery points to the testimony of Malarcik, who critiqued the decision to recommend a guilty plea, trial counsel testified that he spoke to "a number of attorneys who had experience in death penalty" representation who were "[m]ost all were in agreement with [the] approach" to plead and go before the panel.  (Aug. 21, 2017 Tr. Vol. I at 154-55.)

{¶ 179}  Montgomery predicates his argument that he "would have opted for a jury trial, had counsel been effective," on the view that "there was certainly a better chance of

success in avoiding a death sentence" by refusing the three-judge panel option. (Merit Brief of Cross-Appellant at 15.) That argument would not have established ineffective assistance of counsel even had it been substantiated; but even apart from the evidence that the three-judge panel recommendation was made pursuant to a considered strategic decision, the materials to which Montgomery points fail to support his operative thesis.

{¶ 180} Montgomery presented to the trial court through counsel an affidavit from Terri L. Wilson of the OPD's office attaching a spreadsheet purporting to contain "information related to all Franklin County capital cases" from 1988 to 2013. (E-filed copy of hearing Exhibit 20, Admitted at Hearing, ¶ 6.) He cites that material to us as establishing that "between 2003 and the start of Montgomery's trial, there had not been a single death sentence imposed by a Franklin County jury." (Merit Brief of Cross-Appellant at 15.) True enough, according to the proffered spreadsheet. But the same data also purports to show that after two death sentences imposed by juries in 2002, the next capital sentence was Montgomery's. So just as there "had not been a single death sentence imposed by a Franklin County jury" from 2003 on, neither had there been such a sentence imposed by a three-judge panel (again, at least as shown in the exhibit given the trial court). (Merit Brief of Cross-Appellant at 15.) Moreover, the spreadsheet reflects that for the 2003-2012 timeframe (by indictment) identified as significant by Montgomery's brief, three-judge panels had imposed life sentences in cases with capital specifications in at least 3 cases from 2003, 2 from 2006, and 2 more from 2007. (Merit Brief of Cross-Appellant at 15.) Further still, of the 6 capital sentences reflected in Montgomery's spreadsheet as coming before his case, 5 are listed as having been imposed after a jury trial; and of the 14 three-judge panels listed, 13 are shown to have imposed life terms of one form or another. (Merit Brief of Cross-Appellant at 15.)

{¶ 181} Different statistics would not make for a winning argument on a strategic call of this nature, but the numbers cited from exhibit 20 do not advance Montgomery's position at all. While Montgomery averred at his postconviction hearing that the Thorazine he was on made him feel "[c]alm," and, separately, that he decided to waive a jury on the advice of counsel whom he trusted, the trial court did not abuse its discretion in concluding that counsel was not deficient for not having advised Montgomery differently on exercising the panel option. (Sept. 5, 2017 Tr. Vol. V at 979, 1003.)

{¶ 182}  We find the trial court did not abuse its discretion when ruling that Montgomery did not receive ineffective assistance of counsel when he was advised to go before the panel and plead guilty.

{¶ 183}  Accordingly, we overrule Montgomery's first assignment of error.

## IV. CONCLUSION

{¶ 184}  Having overruled the state's five assignments of error, as well as Montgomery's two cross-assignments of error, we affirm the trial court's denial of Montgomery's postconviction claims regarding his assertions of ineffective assistance of counsel during the plea/trial phase and affirm the trial court's granting of Montgomery's postconviction claims regarding his assertions of ineffective assistance of counsel during the mitigation/sentencing phase.  Accordingly, we remand this matter to the Franklin County Court of Common Pleas for action consistent with this decision.

*Judgment affirmed; cause remanded.*

BRUNNER, J., concurs.
NELSON, J., concurs in part and dissents in part.

NELSON, J., concurring in part and dissenting in part.

{¶ 185}  I make no brief for the death penalty.  It is premised, perhaps, on a view of governmental infallibility that finds little basis in our general experience.  And then, to hedge that bet, it necessarily requires seemingly unending procedural measures that exact significant costs not limited to time and money.

{¶ 186}  But capital punishment, or at least the formality of capital sentencing, remains envisioned by the law of our state.  And here, the record shows no credible evidence that the defense decision not to call Doctors Fradkin and Stinson was anything other than a reasoned, indeed prudent, strategic determination taken in furtherance of a calculated mitigation presentation that their testimony could have undermined. On my understanding of the law and my reading of the record as well and carefully recounted by the majority, I am constrained to conclude that the trial court erred in setting aside the earlier sentence that had been affirmed on direct appeal.  Very respectfully, and with a reluctance enhanced by the particular gravity of this context, I dissent to that extent as specified below.

{¶ 187}  Let's cut to the chase.  The trial court found that defense counsel's calculated decisions not to call "at the very least Stinson and Fradkin" was deficient in a

way that prejudiced Mr. Montgomery. Postconviction Decision at 69. One would have testified, among other things, that the supposedly "dissociated" Montgomery disclosed that before he stabbed Tia to death, he informed her that he had engaged in anal sex with her sister. (I imagine—as perhaps the three-judge panel would have—that the phrasing wasn't quite that.) The other would have been interrogated on Montgomery's brutal history of stomach-turning domestic violence and an earlier threat to kill another lover and her children. Such revelations, in the cause of further depicting the killer as himself a victim (a cause perhaps already in some tension with the selected 'he takes full responsibility' mitigation line), would indeed—as the majority is frank to concede—have carried "immense 'negatives.' " *See supra* at ¶ 151.

{¶ 188} The majority's only real support for the proposition that opting to avoid this sort of testimony was anything other than a strategic or tactical decision based on rational concerns is that a lawyer who was not part of the defense team at the trial stage now opines in retrospect that all this could have been sugar coated. " '[I]t depends on what your experts can say to put it into context. That's how you mitigate it.' " *See supra* at ¶ 155, quoting lawyer Malarcik, Aug. 25, 2017 Tr. Vol. IV at 917 (also acknowledging, after speculating about hypothetical motions in limine, that "it comes in"); *see also id.*, quoting Tr. at 906 (" 'Sure, there's some risk and there's some downside there, but that's not the end of the analysis, obviously' "); *id.* at ¶ 157 (Malarcik aware of "the substantial negatives * * * of presenting the expert testimonies of Drs. Stinson and Fradkin" but "[n]otwithstanding" those immense problems "opined Montgomery's trial counsel was ineffective" in not presenting them); Aug. 25, 2017 Tr. Vol. IV at 910 (Q. "So does this open the door?" A. "Yes."), 919 (Q. Doesn't Fradkin testimony "tend to weigh against dissociation because [Montgomery] is remembering several details of what happened?" A. "Yes.").

{¶ 189} Respectfully, I do not find that critique or those somewhat cavalier assurances to be "credible evidence" that the defense trial team's calculation was irrational (or even mistaken). The calculus that informed the actual defense team at the time was that Stinson's testimony would not "offset" the negatives it would adduce, *see supra* at ¶ 39, citing Aug. 21, 2017 Tr. at 160, while defense counsel Weisman believes even after the fact that Fradkin's testimony would have brought "more negatives than positives," *see supra* at ¶ 47, quoting Aug. 21, 2017 Tr. at 152. Hindsight may be, to use a phrase rather discredited this year, 20-20. But the result that the three-judge panel imposed does not itself establish

that defense counsel's calculation to refrain from calling the witnesses was wrong, let alone that it could mark ineffective assistance.  Nor does the testimony the majority cites of Public Defender's Office mitigation supervisor Hall at all negate the "immense" downside of the Fradkin/Stinson potential testimony.  *Compare supra* at ¶ 158 (relying particularly on "testimony of Weisman, Hall, and Malarcik" to support trial court's finding of ineffective assistance of counsel).

{¶ 190}  Stepping back:  " 'The defense decision to call or not call a mitigation witness is a matter of trial strategy.  * * * Debatable trial tactics generally do not constitute ineffective assistance of counsel,' " even in the capital case context.  *Pickens*, 2014-Ohio-5445, at ¶ 222 (discussing lack of psychological testimony and quoting *State v. Elmore,* 111 Ohio St.3d 515, 2006-Ohio-6207, ¶ 116).  And as we have said, "[w]hen trial counsel presents a meaningful concept of mitigation, the existence of alternative or additional mitigation theories does not establish ineffective assistance of counsel."  *Turner*, 2006-Ohio-761, at ¶ 28.

{¶ 191}  As the majority notes, the trial court was obliged to apply the double-pronged analysis of *Strickland* to assess Montgomery's ineffective assistance claim.  *Supra* at ¶ 142. The trial court properly recited that this standard means " '[f]irst, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.' "  Postconviction Decision at 57; *see also, e.g., State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 133 (capital case: "Reversal of a conviction or sentence based upon ineffective assistance of counsel requires satisfying the two-pronged test set forth in *Strickland*").  That is, the failure to make either one of the two required showings defeats a claim of ineffective assistance of counsel.  *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989).

{¶ 192}  So we need to home in on the trial court's finding that the requisite prejudice resulted "since the expert testimonies of at the very least Stinson and Fradkin were not presented * * *."  Postconviction Decision at 69 (adding that "since those

testimonies would have connected the dots * * * the undersigned [judge] cannot conclusively state that there is no reasonable probability that the panel would have reached a different conclusion had the experts testified during mitigation"); *see also, e.g.*, June 26, 2019 Brief of Defendant/Cross-Appellant in Response to Appellant's Brief at 22 (citing the trial court's Stinson/Fradkin reasoning as the basis for its ineffective assistance of counsel finding that brief urges be affirmed). It is the potential testimony of defense-retained experts Stinson and Fradkin on which this issue turns, not the gauzy prospect of some other, idealized but untested hypothetical witness. Indeed, the reason the majority and I all find the trial court's postconviction decision "sufficiently detailed and clear 'to allow for meaningful appellate review' " is that "the trial court did make intelligible the basis for its ruling that Montgomery had been deprived of the effective assistance of counsel with regard to mitigation: counsels' performance was deficient because the lawyers should have adduced 'the expert testimonies of at the very least Stinson and Fradkin.' " *Supra* at ¶ 128.

{¶ 193} But the trial court acknowledged that the election not to call those two experts was a conscious decision by trial counsel, not the result of forgetfulness or unthinking neglect: "[T]rial counsel had retained two knowledgeable and capable psychologists who could have provided the expert testimony to help the fact finders understand the relationships between [Montgomery's] untreated childhood traumas and his actions as an adult[.] [T]trial counsel chose not to present that expert testimony to the three-judge-panel." Postconviction Decision at 65. While the trial court had heard testimony (including from Montgomery's former defense counsel, "experienced and certified capital defense attorneys" who "the record demonstrates [had] * * * conducted an extensive mitigation investigation," *Montgomery*, 2016-Ohio-5487, at ¶ 51, 116) suggesting some of the reasons it would have been reasonable for counsel to abjure those experts and focus on Montgomery's direct claim of responsibility, the legal analysis section of its decision does not at all assess or account for such concerns. *Compare, e.g.,* Postconviction Decision at 10-11 (counsel concluded during mitigation phase that Dr. Stinson's diagnosis would not "have outweighed the negative information the doctor knew, including information related to the domestic violence incidents in [Montgomery's] past"; "Dr. Fradkin's report contained damaging information about Defendant and how he was seeking revenge * * * * [T]he doctor also would have testified about [Montgomery's] difficulties with anger and rage. According to Weisman, Fradkin's testimony would have

presented more negative factors than positive ones had he testified during the sentencing phase") *with id.* at 64-69 (analysis of "ineffective assistance of counsel during mitigation" outlines at some length potential defense benefits of expert testimony, but beyond one sentence at page 65 saying that "the State notes counsel had to be mindful of the possibility of opening the door to damaging evidence about Defendant by way of introducing * * * mitigating evidence," fails to balance, assess, or address particular such [necessary] considerations in any way).

{¶ 194} On this record, and where, as the trial court recited, " 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, * * * the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy," ' " Postconviction Decision at 57, quoting *Strickland*, 466 U.S. at 689-90, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955), I would find that the trial court abused its discretion by looking only to half of the equation in counsel's cost-benefit analysis as to whether to call Doctors Stinson and Fradkin. One cannot analyze whether counsel's cost-benefit analysis was unreasonable unless one considers the costs. And the trial court resolutely did not.

{¶ 195} Lead defense counsel Weisman testified at length at the postconviction hearing about his strategic reasons for not calling the expert psychological witnesses that the defense had retained. And as he observed, he had "a significant amount of time" practicing before the three judges on the panel and felt that he understood their "judicial philosophy." Tr. at 75. The record confirms that strategic reasons for not calling these experts abounded, and that their testimony could have been at cross purposes with some of the themes chosen by the defense that Montgomery took full responsibility for his actions and that he demonstrated sincere remorse. *Compare, e.g.*, Postconviction Tr. at 359 (Fradkin says that Montgomery "doesn't know how to tell the truth sometimes because he doesn't want to take responsibility"); *supra* at ¶ 104 (Malarcik faults defense team for not emphasizing Montgomery's acceptance of responsibility *more*), ¶ 115 (quoting trial court acknowledgment that plea and showing of remorse could be factors "considered and weighed against the death penalty"). Again, I find no credible evidence that the choice not to call Fradkin or Stinson was anything but a legitimate strategic election.

{¶ 196} Start with Fradkin. His April 2, 2012 report was not before the three-judge panel. Had he testified, presumably it would have been. In addition to providing

potentially mitigating information, it reasonably could have been construed to report both that Montgomery did recall events surrounding the murder, and more specifically that he recalled having taunted his ex-girlfriend Tia before he killed her. "He talked some about the day he committed the murders. He said it 'just happened.' * * * * [Next paragraph] He reports that day everything from his past surfaced that he had blocked out. He said he was angry about life and angry how nobody else got in trouble, but he did. He said he wishes he could get that day back and that he would have just left. [Next paragraph.] He reported he had never told his girlfriend Tia about any of the abuse. * * * * He told me he was actually having sex with both Tia and her sister * * * * He said he had sex with [the sister] to get revenge on Tia for the times she was having sex with other men. * * * * Before he killed Tia, he told her he'd had anal sex with her sister." Postconviction Exhibit 25-B at 3.

{¶ 197} The trial court did not discuss, at all, whether defense counsel might reasonably have concluded as a matter of mitigation strategy that it might be better not to have the sentencing court hear that "before Mr. Montgomery killed Tia, he told her he'd had anal sex with her sister." Nor does the trial court's decision assess whether defense counsel might reasonably have opted not to put Dr. Fradkin and his report before the three-judge panel to flag Mr. Montgomery's "difficulties with anger and rage," *id.* at 4, or how "he reacted with violence when he became overwhelmed with the feelings of betrayal," or how abuse "survivors" in his position, especially absent the benefit of therapeutic support, "often spend a lifetime trying to find a way to feel powerful and in control again," *id.* at 5. The report also mentioned Mr. Montgomery "going to Domestic violence classes," a subject that Mr. Weisman was intent on keeping away from the panel. *Id.* at 3; Tr. at 159.

{¶ 198} The uncontested testimony at the postconviction hearing was that the defense made a considered decision not to call Dr. Fradkin because it concluded that his testimony, like that of some other potential witnesses, would have provided "more negatives than positives." Tr. at 152. And it was reasonably conceivable that the state would have probed these matters on cross-examination. Indeed, when Dr. Fradkin testified at the postconviction hearing, the prosecution pressed him along these lines:

> Q. He also told you that he was angry with her on that day.
> Isn't that correct?
>
> A. Yes.
>
> Q. And he also remembered telling Tia not to fuck with him.

A. (Witness nodded head.)

Q. And then we also see this discussion of him wanting revenge on Tia.

A. Yes.

Q. And then we see this discussion of before he killed Tia he told her he'd had anal sex with her sister.

He's talking about the day of the killings. Isn't that right?

A. I don't know. I didn't ask him specifically when he told her that.

Q. Why else would you put in the qualifier 'before he killed Tia' if it wasn't talking about that day in a discussion talking about that day?

A. It's a reasonable assumption it was that day. I just -- I don't know because this was many years ago, and that's what I wrote.

Tr. at 367.

{¶ 199} The defense decision not to call Dr. Stinson was made for similar and perhaps only somewhat less dramatic reasons. Mr. Weisman's postconviction hearing testimony described a long process of deliberation about whether to call Dr. Stinson that lasted even past the start of the hearing. *Id.* at 90. Mr. Weisman at the time of the mitigation hearing did not ascribe as much potential benefit to Dr. Stinson's testimony as he and the trial court later did; he felt that the presentation of Dr. Stinson's testimony and an explication of Mr. Montgomery's "psychological issues" would not be as effective with the judges as it might with jurors. *Id.* at 159 (Weisman testimony). On the other side of the equation, Mr. Wiseman observed:

Dr. Stinson was aware of a number of the factors * * * as far as other violent acts by [Montgomery], domestic violence allegations, et cetera. And I had some concern those things would have been brought up if Dr. Stinson testified that we could otherwise keep away from the three-judge panel and not hear about some of those past acts that, frankly, I was doing everything I could to keep anybody from hearing about.

*Id.* at 159; *see also id.* at 158 ("I had some concerns putting Dr. Stinson on. Some of the things that have popped up in [the postconviction hearing with regard to other potential witnesses] Dr. Stinson was aware of").

{¶ **200**} The specific nature of that concern is demonstrated by Dr. Stinson's April 8, 2012 report, which relied in part on mitigation investigator Kelly Heiby's summaries of interviews with potential mitigation witnesses C.D. and T.L. *See* Postconviction Hearing Ex. 27 at 2, fn. 12 (Stinson citation to C.D. interview), 4, fn. 20 (citation to T.L. interview). Among the items there that might reasonably be perceived as contrary to Mr. Montgomery's mitigation interests and to which Dr. Stinson was privy are C.D.'s statements as reported by Ms. Heiby that "[Montgomery] started hitting her after [their son] was born. * * * * She recalled how [Montgomery] hit her in the head with a closed fist and knocked her to the floor, she felt her brain shake. * * * * [She] said she got daily beatings and went to work with bruises. * * * * [She recalled one episode in which Montgomery] was so drunk and high that he was driving her Blazer with a flat tire. She told [Montgomery] he had to leave and he 'beat her to a pulp.' She said [Montgomery] slammed her to the floor and choked her until her daughter came down and jumped on his back and bit him in the ear. [It took police 45 minutes to arrive;] until then [Montgomery] continued beating her. * * * * She said he always made excuses, he never took responsibility. She said [Montgomery] would blame her when he beat her." Ex. 30-B-25. Ms. Heiby's summary of her interview with T.L., as also cited by Dr. Stinson's report, records along with points perhaps more useful for mitigation on psychological grounds that "in 1994 or 1995 she called the police on [Montgomery] because he was hitting her." Ex. 30-B-33 at 2. When their son was two years old, "[Montgomery] had been drinking and pushed a coat rack through the wall. She said she told [Montgomery] she wanted him gone then [Montgomery] said if he goes then they all go. [She] said [Montgomery] pulled out a gun and said he would kill the kids first and then her and himself." *Id.* Weisman understandably considered potential testimony about this episode "very damning." *Supra* at ¶ 42, citing Aug. 21, 2017 Tr. at 136.

{¶ **201**} Yet the trial court's analysis did not reflect this (cost) half of the equation evaluating these manifest concerns to determine whether the defense had made "a tactical, informed decision" when deciding not to put Fradkin and Stinson before the three-judge panel. *Compare State v. Johnson*, 24 Ohio St.3d 87, 91 (1986). That is, the trial court failed

to factor into its analysis the severe potential negatives of this alternative mitigation strategy that could have operated further to undermine the more sympathetic portrayal of Mr. Montgomery that the defense sought to portray, *compare, e.g.,* June 6, 2012 Sentencing Opinion at 5 (pointing to documentation of Montgomery's sexual victimization at the age of four and to his argument that he took full responsibility for the killings). And the record contains no evidence that defense counsel's concerns were unreasonable or imaginary: quite the contrary.

{¶ 202} By not engaging in that assessment and looking to potential costs as well as potential benefits, even when condemning a defense decision that ordinarily would be deemed "a matter of trial strategy," *see Pickens*, 2014-Ohio-5445, at ¶ 222, I think the trial court abused its discretion. *Compare, e.g., State v. S.E.J.*, 8th Dist. No. 105883, 2018-Ohio-2060, ¶ 10, 13, 14 (trial court abused its discretion by failing to undertake required weighing, which would have dictated different result); *State v. Hamberg*, 1st Dist. No. C-140536, 2015-Ohio-5074, ¶ 30-33 (abuse of discretion not to consider required factors; citing *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14, as observing that a decision is " 'unreasonable' " if it " 'lacks a "sound reasoning process" ' "; further citation omitted).

{¶ 203} Moreover, although I agree with the majority that at places the trial court *recited* the correct standard for measuring whether counsel deficiency has prejudiced a defendant, *see supra* at ¶ 165, I do not agree that the recitation shows that the trial court *applied* the correct standard. The thoughtful and experienced trial court judge, whose responsibilities in this matter I certainly do not envy, deserves to be taken at his word. And what he said—in re-defining counsel error and explaining why he reached his finding of prejudice—was that "since" Fradkin and Stinson "were not presented" to the three-judge panel, the trial court "cannot conclusively state that there is no reasonable probability that the panel would have reached a different conclusion had the experts testified during mitigation." Postconviction Decision at 69.

{¶ 204} But (as I take it the majority agrees, *see supra* at ¶ 162) the question before the trial court was not whether the judge was left at least in equipoise, but whether Montgomery had carried his burden of proving prejudice from the claimed error. "On the issue of counsel's ineffectiveness, the petitioner has the burden of proof * * *." *Gondor*, 2006-Ohio-6679, at ¶ 62. "In order to show deficient performance, defendant must prove

that his counsel's performance fell below an objective level of reasonable representation. To show prejudice, defendant must show a reasonable probability that, but for his counsel's errors, the result of the proceeding would have been different." *Jackson*, 2005-Ohio-5981, at ¶ 133, citing *Strickland*; *Bradley*, 32 Ohio St.3d at 143; *see also, e.g., State v. Pagan*, 10th Dist. No. 19AP-216, 2019-Ohio-4954, ¶ 18 (the accused must make both showings). Thus, "the petitioner must submit sufficient operative facts or evidentiary documents that demonstrate that the petitioner was prejudiced by ineffective assistance." *Gondor* at ¶ 62. Because I do not read the trial court's finding that it "cannot conclusively state that there is no reasonable probability that the panel would have reached a different conclusion had the experts testified during mitigation," *id.*, to equate with a finding that Mr. Montgomery had carried his burden of proof to establish a reasonable probability of actual prejudice, and because the trial court expressed that rationale for its conclusion immediately before finding that Mr. Montgomery's "ineffective assistance argument with respect to counsel's performance during the mitigation phase only is well taken and hereby **GRANTED**," *id.* at 69-70 (emphasis in original), I would determine that the trial court strayed from the correct standard.

{¶ 205} To me, however, the trial court's use of the convoluted and improper standard is secondary to the trial court's unexplained failure to credit or analyze why "trial counsel chose not to present that [Stinson and Fradkin] expert testimony." *Compare* Postconviction Decision at 65. The trial court's failure to account for counsel's quite legitimate concerns about the very significant negatives those witnesses would have brought is, to my mind, error that we cannot wish away under the law that binds us.

{¶ 206} I respectfully dissent from the majority in that I would sustain the state's third and fifth assignments of error and would find its fourth assignment moot. I agree with the majority in overruling the other assignments of error from the state and Mr. Montgomery.

_____